Jacqueline M. DOEBELE, Plaintiff,

v.

SPRINT CORPORATION,
et al., Defendants.

Civil Action No. 00–2053–KHV.

United States District Court,
D. Kansas.

Aug. 6, 2001.

Dennis E. Egan, Claudio E. Molteni, The Popham Law Firm, P.C., Kansas City, MO, John B. Gage, II, The Gage Law Firm, P.C., Overland Park, KS, for plaintiff.

Karen R. Glickstein, Shughart, Thomson & Kilroy,P.C., Kansas City, MO, Robert A. Bye, Patricia A. Mullins, Foland & Wickens, P.C., Kansas City, MO, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Jacqueline M. Doebele brings suit against Sprint Corporation and Sprint PCS (collectively referred to as "Sprint")

for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615. She also seeks damages for wrongful discharge. This matter comes before the Court on defendants' Motion For Summary Judgment (Doc. # 103) filed June 1, 2001 and Plaintiff's Motion For Leave To File Surreply In Connection With The Summary Judgment Motion (Doc. # 120) filed July 5, 2001. For reasons stated below, plaintiff's motion for leave to file a surreply is overruled and defendants' motion for summary judgment is sustained.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); see also *Mat-*

*sushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. See *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

For purposes of summary judgment, the following facts are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to plaintiff.

Plaintiff graduated from Kansas State University in 1984 with a bachelor of science degree in Business Administration and an emphasis in accounting. From September 1996 to April 20, 1998, she worked as a financial analyst in the "Tables Group" at Sprint. The function of the Tables Group is not clear, but it was apparently responsible for computer input of billing data so that Sprint PCS could launch its products in new markets. When

she started work, plaintiff received and skimmed an employee handbook. Therefore she was familiar with Sprint's corrective action policy, which outlined a four-step progressive discipline process for dealing with employee misconduct: step one, a verbal reminder, was active for three months; step two, a written warning, was active for six months; step three, a final written warning, was active for 12 months; step four was termination. If an employee had an "active" disciplinary warning, another infraction would lead to the next stage of corrective action. After a corrective action became inactive, however, Sprint would start over at step one of the disciplinary protocol. Plaintiff was also familiar with Sprint's "Time Pool" policy, which allowed employees to draw on a fixed amount of time off for vacation, personal, sick leave or other reasons.

Lorrie McCurdy began supervising plaintiff in March 1997. Bridget Carson, who was a director over the Tables Group, was McCurdy's immediate supervisor.

While plaintiff worked in the Tables Group, several people did not get along with each other. Plaintiff believed that a group of people at Sprint was being "harassed" and "discriminated against" by being recorded or "watched." Exhibit A in Memorandum In Support Of Defendants Sprint/United Management Co. And Sprint Spectrum, L.P.'s Motion For Summary Judgment (Doc. # 104) filed June 21, 2001 ("Defendants' Supporting Memorandum") at 94:3–5. During the spring of 1997, plaintiff began to feel uncomfortable at work. Co-workers told plaintiff that negative comments were being made concerning her character and mental stability. One co-worker told her that there were organized attempts to ostracize and fire her.[1]

In May of 1997, Chris Fluke, a Sprint employee, told Carson that plaintiff had made a comment about jumping off a bridge. Carson spoke with plaintiff about the comment and plaintiff indicated that she had been serious. Carson then gave plaintiff a referral to the Employee Assistance Program.

During a meeting on June 16, 1997, Fluke told McCurdy that two employees felt physically threatened by plaintiff. Specifically, Fluke told McCurdy that Deanne Bohanon, a pregnant employee, was afraid that plaintiff would be jealous of her and might hurt her, because plaintiff wanted to have a family. In addition, Fluke told McCurdy that Denise Smith, a temporary employee, had stated that she did not want to be left alone with plaintiff. On June 17, 1997, McCurdy questioned Smith about her alleged comments. Smith said that she did not know what McCurdy was talking about and denied saying that she did not want to be alone with plaintiff. On June 18, 1997, McCurdy met with Bohanon. Bohanon said that though she was afraid that plaintiff might react badly to finding out that she was pregnant, she was not worried that plaintiff would harm her. Fluke, however, had told Bohanon "I can just see Jackie pushing you down a stairwell when she finds out you are pregnant," and this comment had concerned her. Exhibit J in Plaintiff's Memorandum In Opposition To Defendants' Motion For Summary Judgment (Doc. # 115) filed June 21, 2001 ("Plaintiff's Opposition Memorandum"). McCurdy concluded that Fluke had been untruthful and that "it looks like [Fluke] is orchestrating this." Exhibit E in Plaintiff's Opposition Memorandum (Doc. # 115) filed June 21, 2001 at 79:4–5. Aside from informal counseling and coach-

---

1. The record reveals no details regarding who said what or when these comments were made.

ing, however, McCurdy did not take corrective action against Fluke for telling false stories about plaintiff. Nor did she advise Sprint's director of employee relations that Fluke had orchestrated rumors that plaintiff was a physical threat.

On October 15, 1997, McCurdy gave plaintiff her first annual performance review, for the period covering October 1996 to 1997, and plaintiff received a four per cent merit increase. McCurdy told plaintiff that she was not perceived as a team player, that she had difficulty conveying her ideas to a group, that she overanalyzed situations and that she occasionally hesitated to make suggestions-leading others to believe that she did not know much about her job. McCurdy also told plaintiff that she regularly arrived late to scheduled meetings and exhibited poor leadership skills. Plaintiff expressed dissatisfaction with McCurdy's evaluation in the areas of personal effectiveness, professional knowledge and judgment.[2] McCurdy's documentation indicated that plaintiff's review took three hours and that "[t]he constant maintenance required for one employee is astronomical in comparison to the rest of my staff and the sad part is that it is not getting any better." Exhibit I in Defendants' Sprint/United Management Co. And Sprint Spectrum, L.P.'s Reply To Plaintiff Jacqueline Doebele's Opposition To Motion For Summary Judgment (Doc. # 119) filed July 2, 2001 ("Defendants' Reply Memorandum").

During November and December of 1997, plaintiff expressed concern at Tables Group meetings that she was being ostracized due to disparaging comments made by Fluke.

From January through March of 1998, McCurdy documented several incidents in which she believed that plaintiff had instigated confrontational meetings.

On January 5, 1998, plaintiff asked to speak to McCurdy about a work issue. Plaintiff told McCurdy that she would appreciate it if McCurdy would refrain from asking questions of Linda Wolf, who was on plaintiff's staff, and instead talk directly to her. McCurdy responded that she had merely asked Wolf a question because plaintiff was out.

On January 9, 1998, Linda Weidner, a recently-promoted senior analyst who worked with plaintiff in the Tables Group, told McCurdy that she had had a confrontational meeting with plaintiff. Plaintiff had apparently told Weidner that she did not want her to speak to plaintiff's staff.

On February 25, 1998, plaintiff scheduled a one hour meeting with McCurdy. The meeting started well, but plaintiff became agitated and defensive when McCurdy asked her where she was on a project for which she had received an extension. Plaintiff expressed hostility because Weidner had been promoted to senior analyst and she had not. When McCurdy's meeting room reservation expired at the end of the hour, plaintiff told her that they needed to continue their meeting at the front of the offices because plaintiff still had issues. McCurdy could not accommodate this request because she had another meeting and plaintiff became angry and stormed out of the room.

On March 3, 1998, McCurdy left work early due to illness and she asked Todd Feighner, plaintiff's former supervisor, to give plaintiff her Short Term Incentive ("STI") check and tell her that McCurdy would explain the bonus calculation the next day. Plaintiff asked Feighner several

---

**2.** As defendants used the term, "personal effectiveness" basically dealt with "how well you get along with others, your ability to work as a team ... how you personally interact with other people, customers, whatever, in the work environment." Exhibit H in Plaintiff's Opposition Memorandum (Doc. # 115) at 111:18–25 to 112:1.

times for the bonus calculation sheet, and she sent another supervisor an email which demanded the information immediately. The next day McCurdy met with plaintiff for an hour and a half to discuss the STI check. Plaintiff disagreed with McCurdy's calculation of her bonus and asked to speak with Carson. McCurdy mentioned that tardiness had been an issue in the past, as reflected in her performance review of October 1997; that it was still an issue; and that it affected her bonus. Plaintiff stated that she disagreed with her performance review and had never signed it because she did not want it to be a part of her file. McCurdy explained that the review would be a part of plaintiff's file regardless whether she signed it.

On March 23, 1998, McCurdy gave plaintiff a verbal reminder for receiving inappropriate emails, tardiness and engaging in inappropriate behavior in the workplace. A number of Sprint employees were reprimanded for sending or receiving inappropriate email. McCurdy placed some 15 individuals on either verbal or written warning as a result of the email incident, and plaintiff admits that she had received three inappropriate emails. Plaintiff also admits that she was occasionally tardy to work and that she had been informally reminded that she needed to get to work on time. McCurdy cited plaintiff for inappropriate behavior because of the way plaintiff had responded to the fact that McCurdy had not been immediately available on March 3, 1998 to discuss the STI check.[3]

In 1998, defendants changed the merit review cycle to start in April instead of October. Therefore, in March of 1998, plaintiff received an annual performance review based on her performance from October 1997 to March 1998. In connection with the review, plaintiff received a three per cent merit increase. The record does not reveal the maximum increase available for this period, but three per cent was lower than the maximum. McCurdy noted in plaintiff's written evaluations that she needed improvement in the areas of personal effectiveness and communication.

On April 9, 1998, McCurdy met with plaintiff to discuss plaintiff's new job responsibilities. On June 1, 1998, McCurdy and plaintiff had a telephone conversation about a work issue which involved Weidner. The record does not contain further information about these events, but McCurdy believed that both conversations were confrontational.

In mid-May or early June of 1998, plaintiff had a closed door meeting with Roosevelt Draine.[4] Although the record is not entirely clear, Draine was apparently a new team leader and plaintiff was training him. According to plaintiff's notes, she repeatedly asked Draine questions which he would not answer and she told him that it was his responsibility if things did not go well with his team. According to Draine, plaintiff yelled at him and made him feel physically threatened.

According to McCurdy, plaintiff also had an encounter with Bohanon on June 1, 1998. The record, however, does not reveal details regarding this meeting.

Around this time, on June 11, 1998, plaintiff met with Bonita Holland. Plain-

3. Plaintiff believed that McCurdy had deliberately distributed her check last and treated her differently because Fluke had spread rumors about her mental stability.

4. The date of this conversation is not clear. Plaintiff provides documentation regarding an encounter with Draine on June 5, 1998, but Draine's documentation discusses an incident that he believed was on May 18, 1998. The gist of the documentation from plaintiff and Draine is fairly similar, so the Court assumes that they are discussing one and the same encounter.

tiff felt that Holland had personally attacked her during an analyst meeting. She asked Holland why she had challenged her during the meeting and told Holland that she should not speak out in meetings until she understood what was going on.

On July 17, 1998, McCurdy talked to Abigail Dillard, the Equal Employment Opportunity and Affirmative Action Manager for Sprint PCS, about pursuing further corrective action against plaintiff. McCurdy had learned about plaintiff's encounters with Draine and Holland and she felt that they were unprofessional and warranted discipline. McCurdy's information about these encounters was based on oral reports from Draine and Holland. McCurdy later requested written reports from Draine and Holland but when she first spoke with Dillard, she had not received them. Dillard was concerned that events which could lead to corrective action had not been documented as soon as possible after they occurred, and she did not believe that McCurdy had adequate written documentation to proceed with corrective action. McCurdy got the documentation by July 21, 1998, and notified Dillard. Even with the reports, however, Dillard was not comfortable with the fact that a disciplinary decision would be based on documentation which had been created after the decision had already been made.[5] She was concerned that Carson and McCurdy were attempting to build a file after they had already decided to issue plaintiff a written warning. McCurdy and Carson had the authority to discipline plaintiff, but Dillard advised them that she believed it was not a good idea. Carson

told Dillard that plaintiff was too high maintenance, that she did not produce enough at work and that Carson found herself spending too much time with plaintiff.

Four days later, on July 21, 1998, plaintiff met with Dillard and Kim Klosak, who apparently was employed in the Human Resources department. At the time, plaintiff told them that she felt like "she was in a hostile work environment." Exhibit H to Plaintiff's Opposition Memorandum (Doc. # 115) at 53:21–22. The record does not disclose exactly what plaintiff believed to be hostile about her work environment, but plaintiff mentioned that Draine and Holland were friends with people who wanted to get rid of her. Dillard told McCurdy and Carson about the conversation and said that she would investigate plaintiff's concerns.

The following day, on July 22, 1998, McCurdy placed plaintiff on written warning, the second step in the corrective action process, on account of confrontational incidents between plaintiff and other co-workers (in addition to incidents with McCurdy) and the fact that plaintiff had contacted other co-workers at home after hours to discuss work-related issues.[6] The confrontational encounters all occurred in 1998 and apparently included the encounters with Draine and Holland and the incidents with Weidner on January 9 and Bohanon on June 1. The incidents with McCurdy occurred on January 5, February 25, March 4, April 9 and June 1. During the meeting on July 22, 1998, McCurdy told plaintiff that she could not have closed door meetings with anyone

---

**5.** Dillard shared this concern with Kinney. Dillard claims that she also told McCurdy and Carson about her concern. Carson specifically denies this conversation but McCurdy does not.

**6.** Plaintiff's verbal reminder from McCurdy should have become inactive by June 23,

1998, so it is not clear why McCurdy progressed to step two of the disciplinary scheme. Plaintiff does not question the fact that discipline progressed to the next level, however, or claim that defendants violated the progressive discipline policy in moving to step two.

and that all of her meetings should occur in an open forum or in a smaller conference that would include her manager. After she received the written warning, plaintiff contacted Sprint's Employee Assistance Program and received a referral to Dr. Leonel Urdaneta, a board-certified psychiatrist.

On July 23, 1998, the day after Sprint placed plaintiff on written warning, Dr. Urdaneta examined her. Plaintiff indicated that she was stressed out by work and that she had become frightened that she would lose her job. Plaintiff was agitated and appeared anxious, and Dr. Urdaneta placed her on short-term disability leave for about two weeks, until August 10, 1998, which he later extended through September 28, 1998.[7] In August of 1998, Dr. Urdaneta diagnosed plaintiff with bipolar disorder[8] and attention deficit hyperactivity disorder ("ADHD"),[9] and began treating her with medication. Around August 21, 1998, Dr. Urdaneta learned that plaintiff suffered from a thyroid condition which occasionally causes depression. During this time, Dr. Urdeneta believed that plaintiff's condition was not under full control, but that it had improved. On Sep-

tember 29, 1998, believing that plaintiff could perform her job duties as long as she continued with her medication, Dr. Urdaneta returned plaintiff to work without restrictions.

Before she returned to work, plaintiff told McCurdy that her thyroid would take three to six months to regulate and that she could not handle a heavy workload, overtime hours or too much work-related stress during that period.[10]

Before plaintiff returned from her short-term disability leave, Carson and McCurdy told Dillard that plaintiff would receive a workload similar to other employees in the Tables Group.[11] According to Dillard, she told McCurdy and Carson that plaintiff had been diagnosed with clinical depression, that her emotional outbursts and inability to deal well with others might be related to her medical condition, and that they had a duty to reasonably accommodate plaintiff's disabilities. In the same conversation, Dillard also discussed with McCurdy and Carson the possibility that plaintiff's illnesses might be work-related. McCurdy and Carson deny that this conversation took place, and they claim that they were unaware that plaintiff later re-

---

7. The procedure by which Sprint grants disability leave is not clear. Furthermore, it is not clear how much of plaintiff's leave was under the FMLA or how much of it she took by using vacation, sick leave or other "time pool" leave. The parties, however, refer to this leave period and plaintiff's later leave period as FMLA leave.

8. According to Dr. Urdaneta, bipolar disorder is a "chemical problem in the functioning of the brain." Exhibit I in Plaintiff's Opposition Memorandum (Doc. # 115) at 14:22–24. He explained that while it is a "genetic inborn condition," its expression is "modulated by external events." According to Dr. Urdaneta, the vicissitudes of plaintiff's work had some causative effect on the bipolar problems that she was experiencing in August of 1998. Id. at 14:22 to 15:13. He also testified that some people with bipolar disorder who are medi-

cated might lead a relatively normal life, but that many will "continue to have problems all throughout." Id. at 63:21–24.

9. Dr. Urdaneta explained that ADHD is a biologically inborn condition, but that plaintiff's work made her symptoms more obvious.

10. On December 7, 1998, plaintiff documented this conversation in an email that she sent to Dillard complaining of a hostile work environment. The record reveals no further details regarding the communication about plaintiff's thyroid problem.

11. Dillard later came to believe that McCurdy and Carson had purposely overloaded plaintiff with work when she returned from disability. Dillard allegedly shared this concern with Kinney, but Kinney does not recall the conversation.

ceived the paperwork to file a worker's compensation claim. In any event, McCurdy and Carson did not believe that mental injuries were compensable under worker's compensation.

Although plaintiff returned to work on September 29, 1998, she missed work on September 30 and October 1 and 2, 1998. On October 5, 1998 Dr. Urdaneta asked Sprint to excuse plaintiff's absences, which plaintiff had told him were due to recurring symptoms. Dr. Urdaneta noticed that plaintiff's thinking had slowed down and he "had some concern about the accuracy and objectivity of her judgment in some areas" Exhibit I in Plaintiff's Opposition Memorandum (Doc. # 115) at 33:11–23. He made a note to plaintiff's file that "her judgment was unable to make clear, precise decisions." Id. at 34:8–10. Despite these observations, Dr. Urdaneta believed that plaintiff should give it another try and go back to work.

On October 6, 1998, McCurdy told plaintiff that it was "more important that she be here during working hours so that her associates could work with her than for her to come in on a weekend, then call in sick for two days because she was exhausted." Exhibit R in Plaintiff's Opposition Memorandum (Doc. # 115).

Plaintiff also called in sick and missed work on October 12 and 13, 1998.

In spite of plaintiff's request for a lighter workload, she received a large amount of work in October and November and although she made numerous requests for help, management did nothing to decrease her amount of work at that time. Management did try to reduce plaintiff's workload in December, but defendants still provided plaintiff only half the resources she thought she needed. Meanwhile, plaintiff believed that she had "double the work load" of others in the Tables Group. Exhibit A in Defendants' Supporting Memorandum (Doc. # 115) at 226:1–8.

On October 13, 1998, McCurdy sent Dillard and Carson an email which stated, "I don't know that [plaintiff] is ready to be back at work." Exhibit O in Plaintiff's Opposition Memorandum (Doc. # 115). McCurdy noted in her email that plaintiff had taken four sick days as unscheduled absences (which was more than anyone else in her group) and asked Dillard whether she should counsel plaintiff on the fact that she was at the limit of unscheduled absences or whether Dillard thought that would merely make plaintiff more anxious. On October 29, 1998, Weidner sent McCurdy a memo regarding team issues which stated that "[i]n some of the things I have heard you say lately, it could be interpreted that you have lost all objectivity when it comes to issues involving [plaintiff]." [12] Exhibit P in Plaintiff's Opposition Memorandum (Doc. # 115). Weidner also stated that one team member had an attitude about plaintiff, perhaps due to rumors about previous complaints that other employees had about her. Weidner also stated that she wanted to move to a different department because of the hostile environment in the Tables Group and the fact that "certain individuals are rewarded for poor performance, and unethical practices go undressed." Id. On November 4, 1998, plaintiff went to work after noon. She missed work on November 6; she had said that she would be in after noon but did not go in at all. She also was absent on November 11 (she did not even call in on that day) and November 12, 1998.

On November 18, 1998, McCurdy tried to talk to plaintiff about Weidner assisting

---

12. McCurdy did not share this document with Human Resources, but she did discuss it with Carson.

in her workload. McCurdy and Weidner approached plaintiff in her cubical, but plaintiff appeared visibly angry that McCurdy had brought Weidner and refused to turn from her computer screen to look at them while they talked.

Plaintiff went in after noon on November 23, then missed work from November 30 through December 2, 1998. On December 3, 1998, plaintiff called in sick but said that she would be in after noon. McCurdy made the following note of her conversation with plaintiff: "[plaintiff] sounded like she was groggy or something. But other things have been mentioned as well which makes me wonder about her physical health ... she was slurring her words, very difficult to hear or understand ..." Exhibit R in Plaintiff's Opposition Memorandum (Doc. #115). When plaintiff got to work the afternoon of December 3, McCurdy told her that she needed to have

a doctor's note and refused to discuss work-related issues until plaintiff got the note.[13] Departmental policy in the Tables Group required employees to get a written doctor's release before they returned to work after a medically-related absence. Later that day, plaintiff got a note from Dr. Urdaneta which stated that "[d]ue to illness [plaintiff] has been unable to work November 30, December 1st and 2nd, 1998." Exhibit Q in Plaintiff's Opposition Memorandum (Doc. #115).

Plaintiff was absent 11 days between September 28 and December 4, and Sprint policy authorized corrective action if 40 hours of unscheduled time pool hours were used without advance notice. Plaintiff claims that she did not keep track of the time she had used.[14] On December 4, 1998, McCurdy and Carson put plaintiff on final written warning for attendance issues and inappropriate behavior in the workplace.[15] According to McCurdy, plaintiff's

---

**13.** The record is unclear whether plaintiff was required to get a doctor's note before she returned from prior absences.

**14.** Plaintiff claimed that she could not be certain that she had exhausted her allotment of unscheduled time off because no one ever explained which days were considered "unscheduled." It is undisputed, however, that plaintiff received the employee handbook, which provided in relevant part that:

On January 1, of each year, Time Pool hours that will be accrued throughout the year are available for use.

Scheduled hours must be approved by the employees' [sic] supervisor at least 24 hours in advance. Some departments may require more advance notice.

Unscheduled Time Pool hours are those hours used for absences not approved by the supervisor at least 24 hours in advance. Some departments may require more advance notice.

Unscheduled Time Pool hours are those hours used for absences not approved by the supervisor at least 24 hours in advance. Corrective action may be initiated after 40 such unscheduled hours are used, depend-

ing on the situation. Some departments may outline specific attendance guidelines to address the use of unscheduled Time Pool hours.

Exhibit N in Defendants' Supporting Memorandum (Doc. #105).

**15.** Plaintiff had been on active written warning since July 22, 1998, on account of confrontational incidents between plaintiff and other co-workers (in addition to incidents with McCurdy) and the fact that she had contacted other co-workers at home after hours to discuss work-related issues. In contemplating the next level of discipline, Carson believed that plaintiff could be emotionally volatile or do something physical. Therefore, before she and McCurdy gave plaintiff the final written warning, Carson sent Kinney an e-mail which advised that "someone from network security will be 'around' during our discussions in the event the situation gets out of control." Exhibit S in Plaintiff's Opposition Memorandum (Doc. #115). Carson had asked security to be present for written warnings and terminations for interpersonal relationship problems on previous occasions. In plaintiff's case, Kinney agreed that security would be appropriate.

11 absences had more than exhausted her allotment of unscheduled time pool absences.[16] In citing plaintiff for inappropriate behavior in the workplace, the final written warning referred to the fact that plaintiff had become upset when McCurdy told her that she needed to provide a doctor's release before returning to work.

According to Kinney, however, "[n]othing [was] black and white" with regard to Sprint's policy, Exhibit G in Plaintiff's Opposition Memorandum (Doc. # 115) at 107:23, and according to Dillard, employees who had worse attendance issues than plaintiff had not received corrective action. Plaintiff does not believe that she was upset when McCurdy requested the release, but she felt that it was "a waste of time" and she attempted to discuss it with McCurdy before getting it. Exhibit A in Plaintiff's Opposition Memorandum (Doc. # 115) at 247:7.

Before McCurdy and Carson placed plaintiff on final written warning, Dillard believed that they had lost their objectivity about plaintiff and that their attitude was "we'll follow what you say to do but we want her gone." Exhibit H in Plaintiff's Opposition Memorandum (Doc. # 115) at 89:3–14.

On the evening of December 4, 1998, after she received her final written warning, plaintiff called Dillard to complain that she was being discriminated against by co-workers and management. Dillard told plaintiff to document her concerns in writing and three days later, on December 7, 1998, plaintiff sent Dillard an email which complained of discrimination on the basis of disability, harassment and a hostile work environment. Specifically, plaintiff stated that she had been the victim of harassment by members of management and various co-workers for over two years and that she was being discriminated against for a medical condition over which she had no control. In support of her contentions, plaintiff cited the following specific actions: (1) in spring of 1997, co-workers told her that comments were being made about her mental stability and character in an attempt to get her fired; (2) she was falsely accused of harassing employees and in the summer of 1998, she received a written warning in spite of her efforts to prove her innocence; (3) she received a large workload in October and November of 1998 even though she had told McCurdy in September that she could not handle a heavy workload, overtime hours or too much work-related stress for three to six months because her thyroid would take time to regulate; (4) in November of 1998 she made numerous requests to lessen her workload, to no avail; (5) management attempted to reduce her workload in December of 1998, but still provided only half the resources she needed; and (6) on December 4, 1998 she received a final written warning and felt that she could be terminated for anything that could be interpreted as wrong. Exhibit W in Plaintiff's Opposition Memorandum (Doc. # 115). Dillard knew that she had a duty to investigate, and she forwarded plaintiff's email to Carson that day. She also informed management about the complaint and "their duties not to retaliate in any way." Exhibit H in Plaintiff's Opposition Memorandum (Doc. # 115) filed June 21, 2001 at 30:3–20.

---

**16.** According to plaintiff, Dillard called the time pool issue a "sham issue" since "we were dealing with an ADA issue and I was just concerned that we were placing the company in a position of high risk by taking this position on this." See Plaintiff's Response To Defendants' Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 115) at page 9, ¶ 80. Plaintiff has not attached the cited deposition, however, and the Court must disregard this purported testimony.

On December 6, 1998, plaintiff contacted Weidner and stated that she had been contemplating ways to commit suicide. Weidner thought that plaintiff sounded extremely distraught. Three days later, in "an effort to get an employee much needed help," Weidner sent McCurdy and Carson a memo about plaintiff's behavior on December 6. Exhibit U in Plaintiff's Opposition Memorandum (Doc. # 115).

On December 9, 1998, Dr. Urdaneta wrote Sprint a letter which asked that plaintiff be placed on short-term disability leave through January 11, 1999, retroactive to December 7, 1998. Sprint granted plaintiff short-term disability leave under the FMLA. On December 30, 1998, Dr. Urdaneta extended plaintiff's leave to February 8, 1999.

Around January 14, 1999, Anita Edwards, who worked in the Sprint Human Resources department, sent plaintiff information about applying for worker's compensation benefits. Apparently plaintiff did not request this information and McCurdy and Carson were unaware that plaintiff had received it. Plaintiff did not complete the application for worker's compensation benefits at that time.

During a visit in early February, Dr. Urdaneta extended plaintiff's leave to February 23, 1999. On February 22, 1999 he sent Sprint a letter which stated that plaintiff could return to work on February 23, 1999 and work five hours a day for two weeks, until March 8, 1999, at which time she could resume a 40 hour work week. He also noted that plaintiff should be allowed to leave work for weekly therapy until April 15, 1999, and every two weeks

for therapy after that. He asked that plaintiff have no supervisory responsibility for the first two months. Finally, he asked that plaintiff be in limited stress situations, have limited interpersonal relations and work no more than 40 hours per week.[17] According to Dr. Urdaneta, plaintiff's subjective symptoms as of February 23, 1999 included "vague, suspicious, paranoid ideation, no delusions, preoccupied insight-limited, labile affect." Exhibit I in Plaintiff's Opposition Memorandum (Doc. # 115) at 39:15–17. He nonetheless believed that she could perform routine tasks on a day to day basis in her medicated state.

Rather than returning plaintiff to work on February 23, 1999, defendants began to investigate plaintiff's condition to determine whether they could make the accommodations listed in Dr. Urdaneta's letter. Kinney and Carson sought input about the proposed accommodations from Dr. Urdaneta. On March 8, 1999, Carson sent plaintiff a letter which stated that limited stress and interpersonal relations were not reasonable accommodations under the ADA, but that Sprint could accommodate plaintiff's request to work five hours a day for the first two weeks of her return to work.[18] Carson's letter concluded by saying that plaintiff had until 5:00 p.m. on Wednesday, March 10 to decide whether to accept Sprint's offer and that if plaintiff did not return to work by March 11, 1999, she would assume that plaintiff had voluntarily resigned. The record does not reflect whether Sprint agreed to accommodate plaintiff's requests to leave work for therapy sessions and to have no superviso-

---

17. From Dr. Urdaneta's letter, it is not clear whether his recommendations for limited stress, no overtime and restricted interpersonal relations were indefinite or for the first two months of plaintiff's return to work.

18. Plaintiff did not ask to be transferred to a different position where her requests might be more easily accommodated. On the other hand, although Sprint PCS was hiring 200 to 300 people a week in the first quarter of 1999, it did not consider plaintiff for any other position.

ry responsibilities for two months, or whether plaintiff agreed to the proposed accommodations.

In any event, plaintiff returned to work on March 11, 1999. The same day, she discussed her disability with Kinney. Plaintiff told Kinney that in her opinion, her disability was work-related. Plaintiff states that by this comment, she meant that she intended to file for worker's compensation benefits and she believed that Kinney was going to investigate whether she was eligible. Kinney told plaintiff that Sprint was not contesting her disability at all, apparently meaning that Sprint would not be contesting her disability for the purposes of paid leave.

On March 28, 1999, based on her work in the first half of 1998, plaintiff received a two per cent merit increase. The two per cent raise was near the bottom of the raises in the Tables Group. Plaintiff missed work on March 29, 1999 and missing work on this date used the last of her 1998 Time Pool allotment. Plaintiff then missed work on March 31 and April 1, 1999 (plaintiff apparently used a vacation day for one of these absences and unscheduled Time Pool for the other). On April 5, 1999, plaintiff called and said that she would be late. That day, McCurdy sent Carson and Kinney an email which solicited advice on plaintiff's attendance issues. McCurdy noted that plaintiff had plenty of 1999 Time Pool, but that she was on final written warning for attendance. On April 9, plaintiff called and said that she would be late. She arrived at work at 1:30 p.m. and McCurdy met with her to discuss plaintiff's merit and STI increases, as well as her continued attendance issues. Plain-

tiff was ten minutes late on April 13, 1999. She missed work altogether on April 16, 1999.

Plaintiff had been on disability leave when defendants conducted written evaluations in January of 1999. Therefore plaintiff did not receive a formal evaluation for the period from March 1998 through March 1999 at that time.[19] McCurdy gave plaintiff an oral evaluation on April 9, 1999, however, and told plaintiff that not missing work was critical to her continued employment at Sprint. McCurdy also discussed interpersonal conflicts which plaintiff was having with other employees.

On April 20, 1999, five weeks after plaintiff returned from her second disability leave, McCurdy and Carson terminated her employment for continued attendance problems and inappropriate behavior.[20] At the time, plaintiff had not exhausted her remaining time pool for 1999.

During the periods that plaintiff was actually at work at Sprint, she performed the duties stated in her job description.[21] Plaintiff was able to carry on conversations with co-workers, and she continues to hold conversations today. Plaintiff spoke with family members both before and after she worked at Sprint. Since she has left Sprint, plaintiff has spoken with attorneys, doctors, friends and her family and she has provided three days of deposition testimony in this case. Although McCurdy felt that plaintiff's higher level communication skills were deficient, no one has had difficulty understanding plaintiff's verbal speech. McCurdy believed that plaintiff lacked the ability to communicate issues

---

19. Apparently the written evaluations are conducted before the end of each performance review period.

20. As was typical in Carson's experience, security was present at the termination. Carson stated that "there was a concern that

there could be issues so that was just a precaution." Exhibit F in Plaintiff's Opposition Memorandum (Doc. # 115) at 140:23–24.

21. The record does not indicate what those duties and responsibilities were.

and their resolution as a leadership skill. Nonetheless, plaintiff requested and received McCurdy's permission to attend training classes at Sprint. Plaintiff learned about various computer programs through on the job training and class work, and she even helped create training for some of Sprint's programs.

During the time that plaintiff worked at Sprint, she exercised on a periodic basis and played softball on the company team. This exercise included walking and water aerobics. Plaintiff continued to exercise after she left Sprint. Plaintiff also attended football games for Kansas State University and the Kansas City Chiefs and served on a committee for her local alumni association. Plaintiff went to movies while working at Sprint and she continues to do so. While working at Sprint, plaintiff also dated someone on an "on and off" basis, and they went to church, movies and dinner. Since leaving Sprint, plaintiff has spent about three hours a day working on this lawsuit, researching medical history, indexing tape recordings and assisting with discovery responses. Plaintiff now lives alone. She can drive, care for herself on a daily basis, bathe and feed herself, shop for groceries, run her own errands, take care of personal finances and balance her checkbook. Plaintiff sleeps anywhere from four to seven hours a night.

In this lawsuit, plaintiff alleges that she suffers from bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder. Plaintiff claims that she is substantially limited in the major life activities of caring for herself, speaking, concentrating, sleeping, learning, interacting with others and working extended hours. One side effect of her medication is drowsiness.

Dr. Urdaneta and plaintiff discussed her belief that she was overworked at Sprint and that she was harassed by co-workers and management. While Dr. Urdaneta did not feel that her statements were fully objective, he did not think that they constituted paranoid delusions. During his therapy, Dr. Urdaneta felt that "there were indications that maybe she wasn't taking care of herself as well as she should have." Id. at 50:5–7. Plaintiff told him that she had "no way of expressing her feelings without coming across angry." Id. at 31:15–17.

Lewis Vierling, a vocational rehabilitation expert, reviewed plaintiff's job history and qualifications to determine whether she was employable in a broad range of jobs in various classes. In conducting his evaluation, he took into account the restrictions which Dr. Urdaneta had imposed. He concluded that an individual with plaintiff's skills could work in 20 broad occupational units representing 90 to 100 occupations. The occupational units include bookkeeping, credit analyst, financial analyst, financial counselor, statistical clerk and tax preparer. According to his research, jobs in those broad categories are available in significant numbers in the Kansas City area.

Plaintiff claims that defendants discriminated against her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (Count I), retaliated against her for taking leave under the Family Medical Leave Act, 29 U.S.C. § 2615 (Count III), and wrongfully discharged her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12203(b), and the Kansas Worker's Compensation Act, K.S.A. § 44–501 et seq. (Count IV).[22]

---

**22.** Count II of plaintiff's amended complaint contained a claim of retaliation in violation of the 42 U.S.C. § 12203 of the ADA. At the pretrial conference, the Court granted plaintiff's oral motion to dismiss this claim due to *Boe v. AlliedSignal, Inc.*, 131 F.Supp.2d 1197

(D.Kan.2001), which held that compensatory and punitive damages are not available in an ADA retaliation action. Also at the pretrial conference, the Court allowed plaintiff to add a common law wrongful retaliation claim in

Defendants seek summary judgment on all counts, contending that plaintiff has not established a prima facie case or shown that their legitimate, nondiscriminatory reasons for disciplining plaintiff were pretexts for discrimination.

### Analysis

As an initial matter, plaintiff seeks leave to file a surreply to defendants' motion for summary judgment. Defendants have filed a reply in support of their motion for summary judgment which includes five affidavits and exhibits regarding the issue of pretext. These materials were not included with the original motion for summary judgment, and plaintiff asks the Court to disregard them or allow her leave to file a surreply.

Under D. Kan. Rule 7.1(b), parties are permitted to file a dispositive motion, a response to the motion, and a reply by the movant. Surreplies are typically not allowed by the Court. See *Metzger v. City of Leawood,* 144 F.Supp.2d 1225, 1266 (D.Kan.2001). On the other hand, Federal Rule of Civil Procedure 56(c) requires the nonmoving party to be given notice and a reasonable opportunity to respond to the movant's summary judgment materials. Thus, when a reply advances new reasons or evidence in support of a motion for summary judgment, the nonmoving party should be granted an opportunity to respond. If the district court grants summary judgment for the movant without relying on the new materials and arguments in the movant's reply brief, however, the Court may preclude a surreply. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1164 (10th Cir.1998). The Court has carefully examined the materials present-

ed in defendants' reply brief and has found that it is not necessary to rely on any of the allegedly new arguments concerning pretext. Therefore a surreply is not necessary.

### I. Discrimination In Violation Of The ADA (Count I)

Plaintiff's first claim is that defendants discriminated against her, subjected her to disparate treatment and terminated her, all in violation of the ADA. When considering a claim brought under the ADA, the Court is guided by the McDonnell Douglas analytical framework. See *Williams v. Widnall,* 79 F.3d 1003, 1005 & n. 3 (10th Cir.1996) (explaining application of the analysis in cases under the ADA) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The first step requires plaintiff to demonstrate a prima facie case.

Defendants assert that plaintiff has not established a prima facie case of discrimination because as a matter of law (1) she did not have, did not have a record of, and was not regarded as having an impairment which substantially limited a major life activity, (2) she could not perform the essential functions of her job with or without reasonable accommodation, and (3) the record contains no evidence that defendant discriminated because of her alleged disability. Furthermore, they contend that even if plaintiff does establish a prima facie case, she has not shown that defendants' legitimate, nondiscriminatory reasons for discipline and termination of employment are pretextual.

violation of public policy in Count IV of her complaint. See Pretrial Order (Doc. # 101) filed June 1, 2001. On June 11, 2001, plaintiff filed a motion to amend the pretrial order to reinsert the ADA retaliation claim because of her belief that one of the cases relied on by

Boe had been effectively overruled. On June 25, 2001, the parties entered into a stipulation that substituted the original ADA retaliation claim for the common law wrongful retaliation claim in Count IV. See Joint Stipulation To Amend The Pretrial Order (Doc. # 117).

## A. Prima Facie Case Of Disability

 The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. See 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Pack v. Kmart Corp.*, 166 F.3d 1300, 1302 (10th Cir.1999) (quoting 42 U.S.C. § 12111(8)). To establish a prima facie case under the ADA, plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) she is qualified, that is, with or without reasonable accommodation, she is able to perform the essential functions of the job; and (3) defendants discriminated against her because of her disability. See *Pack*, 166 F.3d at 1302. Because the Court finds as a matter of law that plaintiff is not disabled within the meaning of the ADA, it does not reach the remaining issues.

## 1. Disabled Within The Meaning Of The ADA

Defendants claim that plaintiff has not shown a genuine issue of material fact whether she is a qualified individual with a disability. Under the ADA, a person is considered to have a disability if that individual either (A) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) has a record of such an impairment or (C) is regarded by the em-

ployer as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff alleges that she is disabled under all three standards.

### a. Evidence Of Actual Disability

The Court first analyzes whether plaintiff has sufficiently alleged that she has a physical or mental impairment which substantially limits one or more major life activities. The Court utilizes a three-step process for determining whether a plaintiff has a disability under the first subsection of the ADA's disability definition. See *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Under the first step, the Court must determine if plaintiff suffers from a physical or mental impairment. Plaintiff asserts that she suffers from bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder. Defendants do not deny that these impairments may constitute disabilities under the ADA. Second, the Court will identify those life activities affected by the impairment and determine whether they are major life activities under the ADA. Plaintiff contends that her impairments affect the following major life activities: caring for herself, speaking, sleeping, concentrating, learning, interacting with others and working for extended periods of time.[23] Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching. See 29 C.F.R. Pt. 1630, App. 1630.2(i). Defendants do not question whether caring for oneself, sleeping and learning are major life activities,

---

**23.** In her opposition to defendants' motion for summary judgment, plaintiff recites her claim that she was substantially limited in these major life activities. In responding to defendants' arguments, however, she addresses only three major life activities: communicating, concentrating and interacting with others. Plaintiff's Memorandum In Opposition To Defendants' Motion For Summary Judgment (Doc. # 115) filed June 21, 2001 at 28–37. For all practical purposes, plaintiff has not opposed defendants' argument with regard to the major life activities of caring for herself, sleeping and learning, and the alleged major life activity of working for extended periods of time.

but they contend that concentration and interacting with others are not. The Tenth Circuit has held that "[c]oncentration may be a significant and necessary component of a major life activity, such as working, learning, or speaking, but it is not an 'activity' itself." *Pack*, 166 F.3d at 1305. The Tenth Circuit has not decided whether "interacting with others" is a major life activity. See *Steele v. Thiokol Corp.*, 241 F.3d 1248 (10th Cir.2001) (noting split and comparing *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 15 (1st Cir.1997) with *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234–1235 (9th Cir.1999), cert. denied, 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000)). The Court will assume for purposes of this analysis that interacting with others constitutes a major life activity.

Third, plaintiff must show that her impairment "substantially limits" the major life activities identified in step two. Id. The EEOC's regulations which implement the ADA define the term "substantially limits" to mean that plaintiff is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The three factors to be considered when determining whether an individual is substantially limited in a major life activity are: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

■ **Caring for herself:** Plaintiff makes a bald assertion that she was substantially limited in the major life activity of caring for herself, but she provides no argument or analysis explaining how she was so limited. The only support for plaintiff's position is Dr. Urdaneta's isolated observation that "there were indications that maybe [plaintiff] wasn't taking care of herself as well as she should have." Exhibit I in Plaintiff's Opposition Memorandum (Doc. # 115) at 50:5–7. Specifically, Dr. Urdaneta thought that plaintiff occasionally came to her appointments "dressed in a manner that [he] thought was beneath what [he] expected from her." Id. at 50:23–25. Plaintiff cites no evidence in that she was substantially limited in her ability to care for herself on account of her bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder. Defendants are therefore entitled to summary judgment on this claim. See *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1088 (8th Cir.2001) (substantial limitation on caring for self not shown when plaintiff presented no evidence of difficulty living independently and dealt with matters of personal care, cooking meals, and taking care of finances).

■ **Speaking:** Plaintiff contends that because of her bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder, she was limited in the major life activity of speaking. The uncontroverted facts show, however, that plaintiff was able to carry on conversations with co-workers and continues to hold conversations today. Although plaintiff's supervisor felt that her higher level leadership communication skills were deficient, in that she could not communicate issues and their resolution, no one had difficulty understanding plaintiff's verbal speech. In one conversation

with McCurdy, plaintiff slurred her words and McCurdy found her difficult to understand. Such evidence, however, does not demonstrate a substantial impairment of plaintiff's ability to speak. See *Thalos v. Dillon Companies, Inc.*, 86 F.Supp.2d 1079, 1085 (D.Colo.2000) (fact that plaintiff sounded different from most people when talking and had to concentrate on enunciation did not mean she was substantially limited in the major life activity of talking). In addition, plaintiff testified in deposition for a three day period. See *id.* (two day deposition testimony indicated plaintiff did not have substantial difficulty talking). The record contains no evidence that relative to the average person in the general population, plaintiff had any significant impairment in her ability to speak. Defendants are therefore entitled to summary judgment on this issue.

■ **Sleeping:** Plaintiff argues that because of her bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder, she was substantially limited in the major life activity of sleeping. The uncontroverted facts show that plaintiff sleeps four to seven hours a night.[24] Plaintiff has presented no evidence that she had difficulty sleeping or that her sleep was impaired in any way. The record contains evidence that on one occasion McCurdy thought that she sounded "groggy." General allegations of sleep disturbance are not sufficient to survive a motion for summary judgment. See *Smoke v. Wal–Mart Stores, Inc.*, 208 F.3d 227, 2000 WL 192806, at *5 (10th Cir.2000) (no way to determine from generalized allegations of sleep disturbance whether plaintiff "was significantly restricted as to the condition, manner or duration of her ability to sleep as compared to the average person in the general population"); *Pack*, 166 F.3d at 1306 (episodes of sleep disruption and/or

waking without feeling rested not enough to show problems were severe, long term, or had a permanent impact). Defendants are entitled to summary judgment on this claim.

■ **Learning:** Plaintiff contends that because of her bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder, she was substantially limited in the major life activity of learning. The uncontroverted facts show that plaintiff attended training and learned new programs while employed at Sprint. In fact, she helped develop such programs. Plaintiff has presented no evidence that relative to the average person in the general population, she had any significant impairment in her ability to learn. Defendants are therefore entitled to summary judgment on this claim. See *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 497 (10th Cir.2000) (plaintiff failed to demonstrate that she was significantly restricted in learning when no evidence suggested she experienced greater difficulty than anybody else learning new computer system or any other new material).

■ **Interacting with others:** Plaintiff contends that because of her bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder, she was substantially limited in the major life activity of interacting with others. Although the Tenth Circuit has not decided whether interacting with others is a major life activity, it has held that to demonstrate a substantial limitation, "plaintiff must show that [her] relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." *Steele*, 241 F.3d at 1255 (quoting McAlin-

---

**24.** Because the record does not suggest otherwise, the Court assumes that plaintiff had the same sleep patterns while she worked at Sprint.

din, 192 F.3d at 1235). In this case, the uncontroverted facts indicate that plaintiff attended social activities (such as football games, movies and alumni association events) while she was employed at Sprint. Like plaintiff in Steele, plaintiff has presented evidence that she had hostile interactions with co-workers, but she has not presented evidence that her impairments caused her trouble in dealing with people in general. See id. In Steele the Tenth Circuit found that defendants were entitled to summary judgment because plaintiff had failed to show that his impairments had substantially limited his ability to interact with others. In particular, while plaintiff in Steele had difficulty getting along with his co-workers and was often the subject of nasty comments and jokes, he did not show that he had difficulty getting along with people outside the workplace. That holding dictates a similar result here. Summary judgment is therefore appropriate on this claim.

**Working for extended periods:** In the pretrial order, plaintiff states that her "impairments substantially limited her ability to ... work for extended periods of time." [25] Amended Pretrial Order (Doc. # 118) filed July 2, 2001 at 7. Plaintiff does not specifically state what she means by "extended periods of time," but because one of her requested accommodations was no overtime, the Court assumes the claim is that plaintiff cannot work overtime and that this substantially limits her ability to work.

While working is a major life activity, working overtime is not. Most courts which have addressed this issue have held that inability to work overtime does not substantially limit an individual's ability to work. See *Hemsing v. Philips Semiconductors*, 185 F.3d 874, 1999 WL 476017, at *3 (10th Cir. July 9, 1999) (inability to work overtime coupled with need for early morning shift and position with no running did not constitute substantial limitation on ability to work); *Kellogg v. Union Pac. R. Co.*, 233 F.3d 1083 (8th Cir.2000) (inability to work overtime not substantial limitation on ability to work); *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 599 (6th Cir.1999) (inability to work in excess of eight hours a day not substantial limitation); *Tardie v. Rehab. Hosp. of R.I.*, 168 F.3d 538, 542 (1st Cir. 1999) (same). "To demonstrate that an impairment substantially limits the major life activity of working, an individual must show significant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Maxwell v. AmeriCold Logistics L.L.C.*, No. 99–2209, 2000 WL 210229, at *8 (D.Kan. Feb.8, 2000) (quotations and citations omitted). Plaintiff hints at only one reason why her ability to work was impaired: her inability to work overtime. On this record, her claim is legally deficient and defendants are entitled to summary judgment.

**b. Record Of Disability**

Plaintiff asserts that even if she did not suffer from a disability, defendants dis-

---

**25.** In her complaint, plaintiff cites working overtime as a major life activity which her disability substantially limited. See Complaint (Doc. # 1) filed January 31, 2000. In her opposition to defendants' summary judgment motion, however, plaintiff "tends to agree that 'working overtime' is not truly a 'major life activity,' " but rather an accommo-

dation which she requested from Sprint. See Plaintiff's Opposition Memorandum (Doc. # 115) filed June 21, 2001 at 28 n. 10. The claim that working for extended periods is a major life activity nonetheless reappears in the pretrial order. Therefore, the Court will consider "working for extended periods of time" as an alleged major life activity.

criminated against her because she had a record of disability. The ADA's definition of "disability" may be satisfied by "a record" of an impairment that substantially limits one or more life activities. See 42 U.S.C. § 12102(2)(B). "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R. Pt. 1630, App. 1630.2(k). To satisfy this section, plaintiff must demonstrate that "a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." Id. In other words, the record must show an impairment that satisfies the ADA. Id. In determining whether an impairment is substantially limiting such that it may support a record of disability under the ADA, the following factors are considered: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact" of the impairment. 29 C.F.R. § 1630 .2(j)(2).

▪ Plaintiff fails to explicitly state what "record" she is referring to, how defendants relied on that particular record, whether the record indicated that plaintiff was disabled (and if so, with what disability), or which major life activity her recorded impairment substantially limited. Plaintiff's only support for her argument that she had a record of disability is that she had two leaves of absence during which a physician certified that she was unable to work. The Court therefore assumes the claim to be that defendants relied on a record of some disability that substantially limited her major life activity of working.

Plaintiff's claim must fail because she has not established that defendants' record of disability shows an impairment that satisfies the ADA. This information is critical, because "in order for an individual who has been classified in a record as 'disabled' for some other purpose to be considered disabled for purposes of [the ADA], the impairment indicated in the record must be a physical or mental impairment that substantially limits one or more of the individual's major life activities." 29 C.F.R. § 1630.2(k) (Appendix). Plaintiff has shown that her impairments periodically prevented her from working one job at Sprint, but she has no evidence that they substantially limited her ability to perform other jobs or that she was completely unable to work for any period of time. In fact, the undisputed evidence is otherwise. In summary, plaintiff has not shown that her impairments substantially limited her ability to work. See *Bolton*, 36 F.3d 939, 942 (10th Cir.1994) (to demonstrate that impairment substantially limits major life activity of working, individual must show significant restriction in "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.") (quoting 29 C.F.R. § 1630.2(j)(3)(i)). For this reason, defendants are entitled to summary judgment on this issue.

### c. Regarded As Disabled

Plaintiff claims that even if she did not have a disability or a record of disability, she is disabled because Sprint regarded her as having physical impairments which substantially limited her major life activities. See 42 U.S.C. § 12102(2)(C). The Supreme Court held that to be "regarded as disabled," plaintiff must show "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, non-limiting impairment substantially limits one or more major life activities." *Sutton*

*v. United Airlines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.*

Plaintiff does not claim that defendants believed that she had a substantially limiting impairment which she in fact did not have. Rather, she claims that defendants mistakenly believed that her actual impairments (bipolar disorder and attention deficit hyperactivity disorder) substantially limited her ability to work—when in fact they did not so limit her.[26] Plaintiff relies on the following evidence to support her claim:

(1) Carson referred plaintiff to the Employee Assistance Program because she told Fluke that she felt like "jumping off a bridge;"

(2) "Myths, fears and stereotypes" permeated plaintiff's workplace, as evidenced by the reports which Fluke fabricated to McCurdy;

(3) McCurdy and Carson adopted the view that plaintiff was a physical threat when they barred her from closed door meetings and arranged for security to attend her final written warning and termination "in case things [got] out of hand;"

(4) Weidner reported to McCurdy and Carson her fear that plaintiff might physically harm herself or someone else;

(5) McCurdy's notes mention that plaintiff had mood swings; and

(6) Dillard testified that McCurdy and Carson made up their minds about plaintiff in advance and were merely biding their time until they could get rid of her.

Defendants claim that they are entitled to summary judgment on plaintiff's theory that Sprint regarded her as having physical impairments which substantially limited her major life activity of working. Specifically, defendants argue that because they continued to employ plaintiff and give her work throughout the period in question, the fact that they may have been aware of plaintiff's disability is insufficient to establish a claim. Defendants also argue that the fact that they attempted to accommodate plaintiff does not show they misperceived her as disabled.

■ For purposes of this analysis, the Court assumes that Sprint knew that plaintiff suffered from bipolar disorder, attention deficit hyperactivity disorder, chronic depression or other mental illness. The question is whether plaintiff has presented sufficient evidence that defendants mistakenly believed that those impairments substantially limited her ability to work—when in fact they did not so limit her. Plaintiff's evidence on this point is virtually non-existent. From reports by Fluke and Weidner, Sprint knew that plaintiff had entertained thoughts of suicide, and had referred her to the Employee Assistance Program. Sprint also experienced plaintiff as a confrontational and abrasive employee who had obvious problems dealing with both fellow employees

---

26. While plaintiff claims that she was actually disabled with regard to the major life activities of caring for herself, sleeping, concentrating, learning, interacting with others, and working for extended periods, her other disability claims are distinguishable. In claiming that she has a record of disability and that defendants regarded her as disabled, plaintiff refers only to the major life activity of working. See *Bolton*, 36 F.3d at 942 (working is major life activity).

and management. Sprint elected to address some of these problems by barring plaintiff from closed door meetings and requesting security at her final written warning and termination. While these measures may have offended plaintiff, the record does not suggest that they were unwarranted or that they reflected an allegedly mistaken belief that plaintiff's impairments caused a substantial limitation in her ability to work. The record does not suggest that McCurdy, Carson or other decision-makers entertained myths, fears or stereotypes about plaintiff's bipolar disorder, attention deficit hyperactivity disorder or depression, or that they acted on the basis of any such myths, fears, or stereotypes. The mere fact that McCurdy was aware that plaintiff had received psychiatric help and even her observation that plaintiff had mood swings is not sufficient to show that she regarded plaintiff as disabled in the major life activity of working. See *Steele*, 241 F.3d at 1256 (knowledge of disability and observation that plaintiff was "moody" insufficient to establish regarded as claim). Finally, Dillard's belief that McCurdy and Carson were out to get plaintiff, even if true, does not evidence a mistaken belief that plaintiff was substantially impaired with respect to the major life activity of working.

The fact that defendants gave plaintiff additional work suggests that they believed plaintiff was able to successfully complete her job, and plaintiff had good performance reviews until March 1998. See *Soileau*, 928 F.Supp. at 51 (evidence that employer continued to assign work to ADA plaintiff establishes that employer did not consider plaintiff to be substantially limited in her ability to work). Defendants did not question the quality of plaintiff's work or her ability to do it; in fact the evidence is the opposite. They regarded plaintiff as being able to perform her job despite her mental and physical impairments. See *Gazaway v. Makita U.S.A., Inc.*, 11 F.Supp.2d 1281, 1288 (D.Kan.1998) (plaintiff not regarded as disabled when defendants insisted he keep working and encouraged him to get counseling). In sum, on this record, the Court is confident that a reasonable jury would reach but one conclusion: that Sprint acted in accordance with its individualized assessment of plaintiff's qualifications and job performance, and not because it mistakenly believed that plaintiff's actual, non-limiting impairments substantially limited her in the major life activity of working. Cf. *McKenzie v. Dovala*, 242 F.3d 967, 970–72 (10th Cir.2001) (plaintiff established that defendants regarded her as disabled when evidence showed that they did not re-hire her due to worries about safety, liability and public acceptance), Whether Sprint assessed plaintiff's job performance in an otherwise fair manner, or whether plaintiff received equitable treatment at the hands of McCurdy and Carson, is a question which the ADA does not address and the Court does not reach.

In conclusion, plaintiff has not shown that her impairments (bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder) substantially impaired her with respect to the major life activities of caring for herself, speaking, sleeping, or learning, or the alleged major life activities of concentrating, interacting with others and working for extended periods of time. Moreover, plaintiff has not shown that she had a record of any disability that substantially limited her major life activity of working. Finally, plaintiff has not shown that defendants misperceived her impairments of bipolar disorder, hypothyroidism and attention deficit hyperactivity disorder as substantially limiting her major life activity of working, when in fact the impairments were not so limiting.

## II. Retaliation In Violation Of The FMLA (Count III)

Plaintiff alleges that defendants fired her in retaliation for her exercise of rights under the FMLA.[27] Plaintiff claims that defendants terminated her either because she requested or took FMLA leave.[28] Defendants argue that a causal connection does not exist between plaintiff's request for FMLA leave or her taking of FMLA leave, and her termination. Defendants also argue that plaintiff cannot rebut their legitimate, nondiscriminatory reasons for plaintiff's termination: poor attendance and inappropriate behavior.

The FMLA prohibits an employer from interfering with or denying the exercise or attempted exercise of rights under the Act; discharging or otherwise discriminating against an individual for attempting to exercise those rights; and discharging or otherwise discriminating against an individual for filing a charge of violation of the FMLA or participating or testifying in a proceeding concerning FMLA rights. See 29 U.S.C. § 2615. To state a claim under Section 2615(a)(1), plaintiff must establish that she is entitled to the protections of the FMLA and that defendants interfered with, restrained or denied the exercise of her rights under the Act. The *McDonnell Douglas* burden shifting approach applies to FMLA retaliation claims. See *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–9 (10th Cir.1997). Under that approach, plaintiff's establishment of a prima facie case creates a presumption of retaliation. The burden then shifts to defendants to produce evidence that the adverse employment action was taken for a legitimate nondiscriminatory reason. *Id.* at 208. If defendants meet this burden, the burden shifts back to plaintiff to present evidence that the proffered reason was not the true reason for the employment decision. *Id.*

### A. Prima Facie Case

To establish a prima facie case of discrimination or retaliation under 29 U.S.C. § 2615(a)(2), plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there exists a causal connection between the two actions. See *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (10th Cir.1997); accord *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998). Defendants do not contest that plaintiff's disability leave qualifies as a protected right under the FMLA. They contend, however, that plaintiff has not shown a causal connection between her use of FMLA leave and her termination.

Before plaintiff requested or took FMLA leave, defendants had placed her on corrective action. On March 23, 1998, McCurdy gave plaintiff a verbal reminder; on July 22, 1998, she gave plaintiff her first written warning.[29] Plaintiff went on

---

**27.** In her complaint, plaintiff also alleges that defendants interfered with her rights under the FMLA by not requiring a fitness for duty certificate from her physician upon her return to work. Defendants point out that under 29 U.S.C. § 2614(a)(4), employers "may" request such certification, but they are not obligated to require it. Plaintiff does not contest this point and summary judgment is appropriate on this claim.

**28.** Plaintiff does not specify whether she believes defendants retaliated against her on the basis of her first or second FMLA leave. In order to view the facts in the light most favorable to plaintiff, however, the Court will assume the plaintiff is asserting that defendants retaliated against her for the second leave. This will allow plaintiff to have the best possible inference from temporal proximity for the issues of causal connection and pretext.

**29.** On July 23, 1998, the day after Sprint placed plaintiff on written warning, she contacted Sprint's Employee Assistance Program and received a referral to Dr. Urdaneta. The

FMLA leave from July 23, 1998 through September 28, 1998. Plaintiff received a final written warning on December 4, 1998—barely two months after she returned to work.[30] Plaintiff's second FMLA leave commenced three days later, on December 7, 1998. It ended on February 23, 1999 but because Sprint was investigating her request for accommodation, plaintiff did not return to work until March 11, 1999. Defendants terminated plaintiff on April 20, 1999—six weeks later.

Given the timing of events, plaintiff asserts that the record supports an inference of causation. Defendants argue that the Court should look to the date when plaintiff began her second leave, and not the date when she returned to work. Under this argument, roughly four and a half months separate plaintiff's FMLA leave and her termination. Viewing the record in the light most favorable to plaintiff, as the Court is required to do, plaintiff's theory of the case provides the appropriate analytical framework. From that perspective, it appears that roughly six weeks after plaintiff returned from her second FMLA leave, Sprint terminated her employment. A month is the sort of short time period that can support an inference of causation between FMLA leave and adverse action. See *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (one month between time wife filed complaint and when defendant began disciplining husband supported inference of discrimination); *Ramirez v. Okla. Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994) (one month supports inference). Under these facts, plaintiff has sufficiently supported her prima facie case of retaliation on the issue of causation.

**B. Pretext**

Defendants state that they had legitimate reasons for terminating plaintiff's employment because she had attendance and personal effectiveness problems. Since defendants advance legitimate reasons for their actions, plaintiff may not rest on her prima facie case but must offer evidence that defendants' reason is a pretext for discrimination. See *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396 (10th Cir. 1997);.

When assessing a contention of pretext, the Court examines the facts "as they appear to the person making the decision to terminate plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000); see also *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir.1999) (noting that manager's perception of employee's performance is relevant in determining pretext). The Court may not second guess the business judgment of the employer. See *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999), cert. denied, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999).

corrective action of July 22 apparently precipitated plaintiff's request for a referral. Dr. Urdaneta placed plaintiff on FMLA leave when he first examined plaintiff on July 23, 1998; plaintiff had not sought or taken FMLA leave before that date.

**30.** As with plaintiff's first FMLA leave, it appears that the corrective action of December 4, 1998 precipitated plaintiff's visit to Dr. Urdaneta and his decision to place her on FMLA leave effective December 7, 1998. Plaintiff visited Dr. Urdaneta on December 9, 1998, five days after she received the final written warning, and Dr. Urdaneta asked that she be placed on FMLA leave retroactive to December 7, 1998. Apparently plaintiff did not attend work on December 8 or 9—the days immediately following her final written warning.

The relevant question is whether the reason articulated by the employer was the real reason for the challenged action. Timing is not necessarily enough to support an inference of pretext. See *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th Cir.2001).

To support her charge of pretext, plaintiff does not rely solely on the timing of events; she also cites the testimony of Dillard, who allegedly expressed concern that McCurdy and Carson were building a file on plaintiff and that the time pool issue was a "sham issue" as to plaintiff. See Plaintiff's Response To Defendants' Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 115) at page 9, ¶ 80. As previously noted, however, plaintiff has not attached a copy of the cited deposition testimony and the Court cannot consider it.[31] Defendants point out that Dillard first made these alleged comments before plaintiff took her first FMLA leave, nine months before plaintiff's termination. Because the deposition transcript is not available, however, the Court cannot properly assess the context and import of Dillard's testimony.

Notwithstanding any implausibilities, inconsistencies, or contradictions in defendants' course of conduct, the Court is convinced that plaintiff has not shown a genuine issue of material fact whether the proffered reasons for termination are unworthy of belief. The evidence that plaintiff had serious attendance problems is overwhelming and undisputed,[32] and the record contains no evidence that McCurdy and Carson administered defendants' attendance policy in a discriminatory or retaliatory manner. Even if the Court were to consider Dillard's alleged concern that the time pool issue was a "sham," plaintiff would not succeed in demonstrating a gen-

**31.** Plaintiff argues that while defendants allegedly terminated her for lack of effectiveness in interpersonal workplace relationships, she had asked them to accommodate her disabilities by limiting her interpersonal relationships at work. Because the Court has determined that plaintiff was not a qualified individual with a disability for purposes of the ADA, defendants had no duty to accommodate her bipolar disorder, hypothyroidism attention deficit hyperactivity disorder. In any event, defendants' failure to accommodate her alleged disabilities does not tend to show that they retaliated against her for taking FMLA leave or that they terminated her employment for reasons that were pretextual. If anything, plaintiff's argument is a tacit admission that she did lack effectiveness in interpersonal workplace relationships.

**32.** As early as October 15, 1997, at plaintiff's first annual performance review, McCurdy counseled her that arriving late to meetings exhibited poor leadership skills. On March 3, 1998, McCurdy admonished plaintiff about tardiness. Plaintiff got a verbal reminder for tardiness on March 23, 1998. When plaintiff returned from FMLA leave on September 28, 1998, her attendance issues became even more pronounced. Plaintiff missed work from September 30 to October 2. On October 6, 1998, McCurdy admonished plaintiff about attendance issues. Plaintiff missed work on October 12 and13, 1998. On November 4, 1998, plaintiff came in after noon. Plaintiff missed work on November 6, 11 and 12, 1998. On November 23, plaintiff came in after noon. Plaintiff missed work from November 30 through December 2, 1998. On December 3, 1998, plaintiff went to work after noon. On December 4, 1998, McCurdy and Carson put plaintiff on final written warning for attendance issues (along with inappropriate behavior issues). Plaintiff apparently did not go to work on December 7 or 8, 1998, so Dr. Urdaneta asked that her short-term disability leave be made retroactive to those days. Plaintiff returned to work on March 11, 1999, but she missed work on March 29, March 31 and April 1, 1999. On April 5 and 9, 1999, plaintiff was late. On April 9, 1999, McCurdy met with plaintiff to discuss on-going attendance issues. Plaintiff was late on April 13, 1999 and missed work altogether on April 16, 1999. On April 20, 1999, McCurdy and Carson terminated plaintiff.

uine issue of material fact that her "attendance problems" were a pretext for retaliation.[33] In of April 1999, plaintiff had plenty of 1999 Time Pool, but she was on final written warning for attendance—a separate issue. In the face of the undisputed evidence that plaintiff had serious attendance problems which predated her first request for FMLA leave and persisted throughout the disciplinary process, no rational jury would find that plaintiff's attendance problems, as a stated reason for termination, were a mere pretext for retaliation under the FMLA. See Morgan, 108 F.3d at 1324–25 (plaintiff not able to show that concern over excessive absenteeism was pretextual).

As to the claim that defendants terminated plaintiff's employment for inappropriate behavior, the evidence that plaintiff had serious interpersonal problems is similarly overwhelming and undisputed. Depending on the issue at hand, plaintiff has variously claimed that she was legally disabled with respect to the major life activity of interacting with others, or that defendants *mistakenly believed* that she was so disabled. While plaintiff has failed in her efforts to both exaggerate and minimize the extent of her difficulties, she has never denied that she had serious interpersonal problems at work. Dillard's testimony is not sufficient to create a genuine issue of material fact on this issue; the record compels an inference that even if McCurdy and Carson were out to get plaintiff, it was because she was an intractable management problem (i.e. as defendants claim, she had serious interpersonal

problems with both supervisors and fellow employees) and not because she exercised her rights to take FMLA leave. Like plaintiff's attendance problems, these problems predated plaintiff's first request for FMLA leave and persisted until the time of her termination. In the face of the record evidence, no reasonable jury would find that plaintiff's interpersonal problems, as a stated reason for termination, were unworthy of belief. Nor would a reasonable jury find that these reasons were a mere pretext for defendants' intent to retaliate against plaintiff for exercising her rights under the FMLA.

Defendants are entitled to summary judgment on this claim.

### III. Wrongful Discharge And Retaliation In Violation Of The ADA (Count IV)

Count IV claims that defendants retaliated against plaintiff for engaging in protected activity under the ADA and that defendants wrongfully discharged her because she might file a worker's compensation claim.

### A. Retaliation In Violation Of The ADA

Plaintiff contends that defendants fired her on April 20, 1999 because she had sent Dillard a written complaint of discrimination on December 7, 1998 and requested accommodations through Dr. Urdaneta on February 22, 1999. Defendants claim that they are entitled to summary judgment

---

**33.** The time pool issue apparently had to do with whether plaintiff's sick days should be counted as scheduled absences or unscheduled absences under the time pool policy. Under the policy, unscheduled time pool hours were those used for absences that were not approved by a supervisor 24 hours in advance, and "depending on the situation," corrective action could be initiated after 40

such unscheduled hours were used. Dillard apparently believed that corrective action was not appropriate in plaintiff's case since "we were dealing with an ADA issue," and defendants apparently did not discipline plaintiff for using more than 40 hours of unscheduled time pool. In defendants' view, the problem was more significant, since she was on final written warning for larger attendance issues.

because plaintiff cannot show a causal connection between her protected activity and any adverse employment action.[34]

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). As with claims for discrimination, if plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action "is pretextual, i.e. unworthy of belief." *Morgan*, 108 F.3d at 1323.

### 1. Prima Facie Case

 Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation: (1) that she engaged in an activity protected by the statute; (2) that "she was subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity;" and (3) that there was a causal connection between the protected activity and the adverse action. *Anderson*, 181 F.3d at 1178.

Plaintiff asserts, and defendants do not contest, that her complaint to Dillard and her request for accommodations constitute protected activities. Defendants terminat-

ed her employment on April 20, 1999, and plaintiff contends that the temporal proximity between her protected activities and the adverse employment action meets her burden of showing a causal connection. Defendants disagree.

 For the purposes of summary judgment, the Court looks at the record in the light most favorable to plaintiff. McCurdy fired plaintiff more than four months after she sent Dillard a written complaint of discrimination and about two months after she requested accommodations through Dr. Urdaneta.[35] Plaintiff does not attempt to make her prima facie case by showing that defendants' asserted reasons for her termination are unworthy of belief. She relies strictly on timing, and the evidence in this regard is sufficient to support an inference of causation with respect to plaintiff's request for accommodations, but not with respect to her complaint of discrimination. In determining whether a causal nexus exists, the Court will accept the date most favorable to plaintiff. See *Anderson*, 181 F.3d at 1179. Defendants fired plaintiff two months after she requested accommodations. Interpreting the facts in the best light for plaintiff, a two month separation between the protected activity and termination is close enough to support a showing of causation. See *Sink v. Wal–Mart Stores, Inc.*, 147 F.Supp.2d 1085, 1098 (D.Kan.2001) (four months too long to support causation); *Pastran v. K Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000) (two month sequence

---

**34.** Defendants contend that plaintiff's verbal warning, written warning and final written warning cannot constitute adverse actions because plaintiff had not engaged in protected activity under the ADA prior to those incidents. The Court need not address this argument, however, because plaintiff cites only her termination as an adverse action.

**35.** Plaintiff reiterates her argument that the relevant date is not when she requested ac-

commodations, but the date when she returned to work. Since plaintiff contends that defendants fired her on April 20, 1999 because she had sent Dillard a written complaint of discrimination on December 7, 1998 and requested accommodations through Dr. Urdaneta on February 22, 1999, however, it is only logical to use the dates of the protected activity as the relevant dates for purposes of analyzing causation.

of events sufficient to support causation); *Anderson,* 181 F.3d at 1179 (two months and one week sufficient) (comparing *Ramirez v. Okla. Dept. of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation) with *Richmond,* 120 F.3d at 209 (three-month period, standing alone, is insufficient to establish causation)). Plaintiff has therefore presented a prima facie case that defendants retaliated because she requested accommodations through Dr. Urdaneta.

**2. Plaintiff's Showing Of Pretext**

■ Defendants contend that even if plaintiff establishes a prima facie case, they had a nondiscriminatory reason for terminating plaintiff's employment: plaintiff had attendance issues and personal effectiveness problems. These reasons are nondiscriminatory; accordingly plaintiff must present evidence that defendants' proffered reasons are pretextual. To support her pretext argument, plaintiff relies on the arguments which she advanced with respect to her FMLA retaliation claim. Specifically, she relies on the timing of events plus Dillard's belief that McCurdy and Carson were building a file on her and that the time pool issue was a sham. As previously noted, plaintiff has not attached a copy of the cited deposition testimony that the time pool

issue was a "sham," and the Court cannot consider it. Also, as noted earlier, defendants provide conclusive evidence that plaintiff had attendance problems. Even if Sprint did not have a black and white rule about attendance, plaintiff had ample notice through repeated warnings what the rules were in her department and she did not abide by them. While the record contains evidence that McCurdy and Carson wanted to get rid of plaintiff, it contains no evidence—aside from the timing of events—that their agenda was a pretext for unlawful retaliation under the ADA. Furthermore, as discussed in detail in Section II(B), McCurdy had begun to discipline plaintiff before she engaged in protected activities.[36] See *Soileau,* 928 F.Supp. at 54 (summary judgment appropriate when evidence showed that plaintiff's difficulties at work predated acknowledgment that he was suffering psychological problems because prior difficulties negated inference that his termination came as a result of either his requested accommodation or his alleged disability). Even considering Dillard's comment, plaintiff has cited no evidence that retaliation for protected activity played any part in the decision to terminate plaintiff's employment. At best Dillard's comment shows that McCurdy and Carson had a long-standing plan to get rid of plaintiff because she was a high maintenance em-

---

**36.** The ADA was not meant to protect poorly performing employees from discharge. As the court noted in *Henry v. Guest Servs., Inc.,* 902 F.Supp. 245 (D.D.C.1995):

Retaliatory discharge is both deplorable and unlawful, and cannot be countenanced. However, an employee whose performance is truly inadequate cannot be allowed to use the vehicle of an EEO complaint to interfere with an employer's right to discharge a nonperforming employee. To allow the antidiscrimination laws to be used by poorly performing employees will

eventually work to the detriment of those who have a legitimate need for the protection of the laws. What is more, if employers have to keep on their payrolls poorly performing employees, this nation's business community will be unable to compete in the global marketplace. The purpose of the antidiscrimination laws was not to create a bloated private bureaucracy and thereby undermine our finely tuned free enterprise system.

902 F.Supp. at 253–54.

ployee who could not get along with others and was frequently absent from work.[37] Her comment does not show pretext; if anything it shows the opposite. Plaintiff has not demonstrated a genuine issue of material fact with regard to defendants' stated reason for termination. See *Clay v. City of Chi. Dep't. of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998) (proof that employer once considered plaintiff an adequate employee before her discharge does not suggest that defendants' explanation for her discharge was retaliatory).

■■■ Without any other evidence, plaintiff merely has the timing of the incidents to rely upon. While timing was sufficient for plaintiff's prima facie case, temporal proximity standing alone is not enough to show pretext. See *Selenke*, 248 F.3d at 1266; *Pastran*, 210 F.3d at 1206. Timing is particularly insufficient when an employee has engaged in unacceptable behavior in the interim between her protected activity and termination. See *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (intervening unprotected conduct eroded any causal connection suggested by the temporal proximity of plaintiff's protected conduct and termination). For these reasons, defendants are entitled to summary judgment on plaintiff's ADA retaliation claim.

## B. Worker's Compensation Retaliation

■■■ Plaintiff also argues that defendants fired her because they anticipated that she would file a worker's compensation claim. Kansas is an at-will employment state. See *Ortega v. IBP, Inc.*, 255 Kan. 513, 516, 874 P.2d 1188, 1191 (1994). Kansas recognizes an exception to employ-

ment-at-will, however, where an employee is terminated in retaliation for exercising rights under the Kansas workers' compensation laws. See *Murphy v. City of Topeka–Shawnee County Dep't of Labor Servs.*, 6 Kan.App.2d 488, 496–97, 630 P.2d 186, 192–93 (1981). This exception also applies when an employer retaliates against an employee after a work related injury, but prior to the actual filing of the workers' compensation claim. See *Chrisman v. Philips Indus., Inc.*, 242 Kan. 772, 775, 751 P.2d 140, 142 (1988). In analyzing a retaliatory discharge claim, the Kansas Supreme Court has adopted the familiar *McDonnell Douglas* burden-shifting analysis. See *Ortega*, 255 Kan. at 526, 874 P.2d at 1196. First, plaintiff must present a prima facie case of discrimination. The burden of going forward with evidence then shifts to defendants and "this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for [their] conduct." *Id.* If defendants meet this obligation, plaintiff must then prove that "the reasons offered by [defendants] were merely a pretext for discrimination." *Id.* (quotation omitted). Under Kansas law, the party "having the burden of proving a discharge from employment in retaliation for having filed a workers' compensation claim must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Id.* at 1198.

■■■ Defendants argue that plaintiff has failed to state a prima facie case of retaliatory discharge because she has not filed a worker's compensation claim or sustained an injury for which a worker's compensation claim could be asserted. A prima facie case of retaliatory discharge

---

**37.** McCurdy's notes from plaintiff's annual performance evaluation on October 15, 1997 state that "[t]he constant maintenance required for one employee is astronomical in comparison to the rest of my staff and the sad part is that it is not getting any better." Exhibit I in Defendants' Reply Memorandum (Doc. # 119) filed July 2, 2001.

requires a showing of four elements: (1) the employee filed a workers' compensation claim or sustained an injury for which a workers' compensation claim could be asserted in the future; (2) the employer had knowledge of the workers' compensation claim or the fact that the employee had sustained a work-related injury; (3) the employer terminated the employee; and (4) a causal connection exists between the protected activity or injury and the termination. See *Ortega v. IBP, Inc.*, No. 92–2351, 1994 WL 373887, at \* 6 (D.Kan. July 1, 1994).

 Plaintiff apparently contends that while she has not filed a worker's compensation claim, she is entitled to do so. Defendants argue that mental injuries, absent physical injury, are not compensable under the Kansas Worker's Compensation statute. For the purposes of the worker's compensation statute, personal injury is defined as "any lesion or change in the physical structure of the body." 2001 Kan. Sess. Laws 2301. Kansas law is well established that "the obligation of an employer under K.S.A. § 44–501 et seq. does not extend to mental disorders or injuries unless the mental problems stem from an actual physical injury to the claimant." *Followill v. Emerson Elec. Co.*, 234 Kan. 791, 796, 674 P.2d 1050, 1053 (1984) (plaintiff who saw co-worker killed at work not eligible for compensation). Plaintiff does not respond to this argument and she does not claim that her mental impairments stem from any physical injury due to an accident at work.[38] Defendants are therefore entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that defendants' Motion For Summary Judgment (Doc. # 103) filed June 1, 2001 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Leave To File Surreply In Connection With The Summary Judgment Motion (Doc. # 120) filed July 5, 2001 be and hereby is **OVERRULED.**

---

**38.** Plaintiff spends a good deal of time discussing her belief that the Kansas courts have been steadily extending protection for employees who are engaged in protected activity. It is not the place of this court, however, to supplant established state law on a state law claim. See *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (holding that federal court sitting in diversity must apply state substantive law).