Thomas **WIRTZ**, Plaintiff,

v.

**KANSAS FARM BUREAU SERVICES, INC.**, Defendant.

No. 01–2436 KGS.

United States District Court, D. Kansas.

June 5, 2003.

See also, 274 F.Supp.2d 1215, 2003 WL 21757494.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiff.

Deena Hyson Bailey, Teresa L. Mah, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

SEBELIUS, United States Magistrate Judge.

This matter comes before the court on defendant Kansas Farm Bureau Services, Inc.'s Motion for Summary Judgment. (Doc. 55). Plaintiff Thomas Wirtz presents claims of gender discrimination, sexual harassment, and retaliatory discharge, and seeks relief pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII" or "Act").[1] Having carefully considered the parties' evidentiary submissions, arguments, and applicable law, the court finds that defendant's motion for summary judgment should be denied.

### I. Summary Judgment Standard.

Summary Judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[2] For pur-

---

1. 42 U.S.C. §§ 2000e *et seq.*

2. Fed.R.Civ.P. 56(c).

poses of reviewing a summary judgment motion, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[3] A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4] Thus the appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[5]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[6] To meet this standard, the moving party that does not bear the ultimate burden of persuasion at trial does not need to negate the claims of the non-movant; instead, the moving party can simply point out the absence of evidence for the non-moving party on an essential element of that party's claim.[7] Once the moving party satisfies this initial burden in a properly supported motion, the burden shifts to the non-moving party to show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[8] The non-moving party may not rest on mere allegations or denials in its pleading in opposition to summary judgment, but "must set forth specific facts showing that there is a genuine issue for trial."[9] Therefore, the mere existence of some alleged factual dispute between the two parties will not defeat a properly supported motion for summary judgment.[10] The court must consider the record in the light most favorable to the non-moving party.[11]

Summary judgments "'should seldom be used in employment discrimination cases.'"[12] Employment discrimination cases often turn on the employer's intent, and the courts generally consider summary judgment inappropriate in deciding such questions of intent.[13] However, summary judgment is not always improper, and it may be useful in weeding out claims obviously lacking in merit.[14] The policy disfavoring pre-trial disposition of employment discrimination claims makes it difficult for the court to grant summary judgment even in what appears to be this relatively weak case. There are very plausible non-discriminatory and non-re-

3. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

4. See *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

5. *Id.* at 251–52, 106 S.Ct. 2505.

6. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). See also *Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1195 (D.Kan.2001), *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir., 1991).

7. See *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000).

8. See *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

9. See *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

10. *Id.*

11. See *Doebele*, 157 F.Supp.2d at 1195. See also *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991).

12. See *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999) (quoting *Smith v. St. Louis University*, 109 F.3d 1261, 1264 (8th Cir.1997)).

13. See *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526, 530 (10th Cir.1994).

14. See *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

taliatory explanations for the defendant's conduct, but juxtaposed with plaintiff's testimony, they present genuine issues of material fact, precluding the grant of summary judgment.

## II. Facts.

The following facts are either uncontroverted or, if controverted, construed in the light most favorable to plaintiff as the non-moving party. Immaterial facts and factual averments not properly supported by the record are omitted.

Defendant, Farm Bureau Services, Inc., ("Farm Bureau" or "FBSI") provides support services, such as information technology services, to Farm Bureau Mutual Insurance Company and affiliated organizations. Plaintiff, Thomas Wirtz, is a former FBSI employee. Between November, 1988 and April, 2000 plaintiff held various positions in the information technology department, and when he left the company in April, 2000, plaintiff was a network specialist. Julie Farley ("Farley") is an employee in Farm Services' Records department.

Plaintiff's claims arise out of defendant's treatment of plaintiff and its decision to terminate his employment for allegedly inappropriate conduct toward a married female co-worker, Ms. Julie Farley. Plaintiff submits that he and Farley engaged in a consensual sexual relationship until she ended the relationship and began to foster a hostile atmosphere at plaintiff's workplace. Plaintiff first met Farley in February of 1999 when he was returning to FBSI's building following an afternoon run. During this chance encounter, plaintiff and Farley exchanged friendly glances. It appears that at the time of this encounter, Farley may have already known the name of the plaintiff and the fact that he had repaired a VCR for another FBSI employee. Approximately three weeks after the initial encounter, Farley visited plaintiff at his house, although it appears that Farley did not actually go into the plaintiff's home. According to plaintiff, he spotted a vehicle leaving his driveway and followed it to a nearby bar, where he approached the vehicle and learned that Farley was the driver. Plaintiff did not report Farley's visit to either their employer or the police.

Without delving into the precise details of each incident, it appears to the court that Farley continued to visit the plaintiff's home, sometimes with other individuals, and began to telephone him at the office and at home. Farley also asked the plaintiff to fix her computer at work and while he was working at her station, she allegedly touched him or hugged him. Although plaintiff claims that the visits, frequent telephone calls, and the hug made him feel uncomfortable, he did not feel that it was "proper protocol" to report Farley's behavior to FBSI. Over time, plaintiff claims a romantic relationship developed between Farley and the plaintiff. Plaintiff alleges that Farley pressured him into having such a relationship. Farley denies that such a relationship existed.

On June 18, 1999, four months after first meeting Farley, plaintiff sent a dozen red roses to her at work. Plaintiff claims the roses were meant as a friendly gesture for Farley, who had just undergone a surgical procedure. The roses attracted the attention of Farley's co-workers, who became interested in the identity of the sender. Farley, who did not appreciate this attention and, according to plaintiff, was fearful of the exposure of their affair, complained to FBSI management. In her complaint, Farley claimed plaintiff made her feel uncomfortable by sending her roses and calling her at work. Farley expressed the desire for plaintiff's behavior to stop.

After receiving Farley's complaint, Mr. Jim Branson (former director of FBSI's

Human Resources department), Ms. Peggy Goe (current director of FBSI's Human Resources department) and Mr. Paul Pullen (plaintiff's former supervisor) requested an explanation from the plaintiff. Mr. Wirtz was surprised to learn of the complaint and informed them that he and Farley had a consensual sexual relationship and that the flowers were his second present to her, the first being a gold bracelet that Farley accepted. During this meeting, plaintiff stated that Farley's complaint was an attempt to sexually harass him, that she initiated and forced him into the relationship, which he initially resisted, that she had repeatedly telephoned him at work, and that her behavior was unwelcome and made him feel uncomfortable. In support of his allegations, plaintiff offered evidence to prove the existence of the relationship.[15] Branson, Goe and Pullen concluded that, because they could not determine the truthfulness of either side of the story, the best course of action was to caution both plaintiff and Farley against further non-work related contact at the office. On June 25, 1999, both Farley and plaintiff signed a memorandum reminding them that the company wished to maintain a professional and productive work environment. The memorandum further required that both parties "maintain a professional job-related posture and only have contact at work that is job-related."

Following this meeting, Farley allegedly called the plaintiff to apologize for "getting him into trouble" and gave him her new, unlisted, home telephone number. Plaintiff and Farley appear to then have resumed contact outside of work hours and company property.

It appears the plaintiff was dissatisfied with the investigation conducted by defendant's management. Although he agrees that FBSI had an obligation to respond to

Farley's complaint, he contends that had FBSI conducted a proper investigation, it would have determined that Farley's allegations were groundless and that in reality he was the victim. Plaintiff claims that Farley had already been reprimanded by defendant for excessive use of the telephone. Furthermore, it appears that defendant's management were also aware of Farley's behavior toward a number of other men at FBSI. Deposition testimony shows that at least two other male employees felt uncomfortable because of Farley's behavior and alleged advances. In particular, it appears that defendant's management had investigated Farley's behavior toward Craig Cline and Greg Mazouk and concluded that such behavior was inappropriate.

From June 1999 until January 2000, plaintiff did not receive any other disciplinary action from FBSI. However, during this same period, plaintiff claims that he was a victim of a hostile work environment. Plaintiff states that employees in FBSI's Records department, who all appear to be women, would "snicker," mutter things under their breath and point and laugh at him. Plaintiff also became aware that Farley called him a "psycho" and spread rumors that she propositioned him and he turned her down. Plaintiff appears to have voiced his concern regarding these rumors and the general hostile atmosphere to his supervisor, Mr. Pullen, on as many as three occasions. Plaintiff also tried, without violating the June 25, 1999 memorandum, to speak with Farley and request that she stop spreading lies about him. He had contact with Farley via telephone outside work hours (although it is unclear to the court who initiated these calls) and left notes on her car. It appears that neither the plaintiff nor Farley complained

---

**15.** Plaintiff claims to have evidence from a razor, hair evidence from a curling iron, telephone log and a receipt for the gold bracelet he allegedly gave to Farley.

to the defendant about any contact that occurred away from the workplace.

In addition to his contacts with Farley regarding the alleged rumors at work, plaintiff also claims that he attempted to collect payments for the VCR repairs he performed for Farley. When these attempts proved unsuccessful, plaintiff resorted to other measures, such as composing an e-mail to Farley's husband and asking another co-worker, Shelly Forrest, to contact Farley. During his conversation with Forrest, the plaintiff appears to have indicated to Forrest that he "could not go on living like this," which led her to believe that he was suicidal. Plaintiff denies he ever contemplated suicide; however, he does admit to being severely distressed.

Following his conversation with Forrest, plaintiff learned that Forrest and Farley complained about his attempt to contact Farley indirectly. Plaintiff was once again questioned by the defendant and, on or about January 25, 2000, was required to sign a memorandum indicating that both direct and indirect contact either on company's time or property was prohibited ("No Contact Memorandum"). Plaintiff claims that he was forced to sign the memorandum under duress. Farley was not required to sign this or any other similar memorandum. Plaintiff further alleges that he was "forced" to take two weeks off from work, and when he returned, he heard that Farley claimed to have gotten him fired.

On April 12, 2000, plaintiff was assigned to travel to either Salina or Hays, Kansas, to provide computer repair services to those FBSI offices. For this trip, plaintiff was issued a company cell phone. At 6:52 a.m., plaintiff placed a call from this cell phone to Farley's home. Farley did not answer. Farley brought her caller ID device to FBSI's management and reported it as a new contact. Ms. Goe and Mr. Pullen determined that the call was placed by plaintiff and requested that he return to the office. After confirming that he indeed telephoned Farley, Mr. Pullen terminated the plaintiff for violating the No Contact Memorandum.

Plaintiff believes that the No Contact Memorandum he executed in January 2000 and his subsequent termination constitute unlawful retaliation for engaging in protected activity under Title VII, and, but for his gender, the termination would not have occurred. Plaintiff claims that his attempts to pass a message to Farley through Forrest and his conversations with Mr. Pullen constitute protected activity. Between June 1999 and January 2000, on three occasions plaintiff contacted his supervisor, Mr. Pullen, to make him aware that Farley was still calling and harassing him and refusing to either return the gold bracelet to him or pay for VCR repairs. However, he claims defendant never investigated his claims against Farley to the same extent it investigated Farley's allegations and, therefore, he states that he was treated differently on the basis of his sex.

## III. Analysis.

### A. Gender Discrimination.

Although Title VII is generally viewed as an avenue of recourse for minority plaintiffs seeking redress for employment discrimination, the Act is also available to majority plaintiffs who have suffered discrimination. The Supreme Court has held that Title VII protects an employee from "reverse discrimination," which occurs when an employer discriminates against a member of an historically favored group.[16]

---

**16.** *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *see also Notari v. Denver Water Dep't,* 971 F.2d 585 (10th Cir.1992).

Analysis of a gender discrimination claim must proceed under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green.*[17] Pursuant to the *McDonnell Douglas* decision, the following three steps are required:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[18]

### 1. Prima Facie Case.

When the plaintiff belongs to a minority group, to establish prima facie case the plaintiff must ordinarily show that "(1) he belongs to a protected class of minority; (2) he was qualified for the job from which he was discharged; (3) he was discharged despite his qualifications; and (4) after the discharge, the position remained open and the employer sought applicants whose qualifications were no better than plaintiff's."[19]

■ In a reverse discrimination case, such as this one, where the plaintiff belongs to a majority group—white males—the Tenth Circuit has modified the first prong of the prima facie case: "In lieu of showing that he belongs to a protected group, [a plaintiff may simply] establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."[20] In the alternative, plaintiff may establish a prima facie case by showing "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff."[21] When the plaintiff uses this alternative method, the plaintiff does not benefit from the presumption of intentional discrimination, which arises only when plaintiff's evidence meets the modified four-step prima facie case.[22] "In other words, it is not enough, under this alternative formulation, for a plaintiff merely to allege that he was qualified and that someone with different characteristics was the beneficiary of the challenged em-

---

**17.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff claims that the burden shifting analysis under *McDonnell Douglas* is only appropriate where there is no direct evidence of discrimination. The court concludes that such interpretation of the case law is erroneous. Evidence of direct discrimination or indirect evidence sufficient to support as a reasonable probability the inference that, but for plaintiff's race, the employment decision would have been different are merely two alternative means of establishing a prima facie case of discrimination within the *McDonnell Douglas* framework. *See Notari,* 971 F.2d at 590 (adopting the *alternative* method of establishing a prima facie case).

**18.** *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citations omitted) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817).

**19.** *See Wolfenbarger v. The Boeing Co.,* 1994 WL 149187, 1994 U.S. Dist. LEXIS 4800 (D. Kan. April 1, 1994) (citing *Trujillo v. Grand Junction Regional Ctr.,* 928 F.2d 973, 977 (10th Cir.1991)).

**20.** *See Notari v. Denver Water Dept.,* 971 F.2d 585, 589 (10th Cir.1992).

**21.** *Id.* at 590.

**22.** *Id.*

ployment decisions." Instead, the plaintiff must "allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status, the challenged decision would not have occurred."[23] The plaintiff did not advance any evidence that FBSI is one of the unusual employees who discriminates against the majority. Therefore, the court must determine whether the plaintiff has presented sufficient direct or indirect evidence to establish a prima facie case of gender discrimination.

■ In this case, plaintiff declines to proceed under the *McDonnell Douglas* presumption and instead claims that he has presented "substantial, clear and persuasive direct evidence of the defendant's discriminatory treatment of Mr. Wirtz."[24] The court disagrees. Evidence of direct discrimination is rare and usually supports allegations of an unquestionable facially discriminatory actions. For example, the court in *McGarry v. Board of County Comm'rs of Pitkin County*[25] found sufficient direct evidence was present where the county personnel director allegedly told the unsuccessful applicant that the position for which he applied was reserved for "minority" or "affirmative action" hiring, made similar notations on written questionnaire, and admitted that those hired were not better qualified than the plaintiff.[26]

There is no evidence in the record that any FBSI employee has ever told the plaintiff that women were more trustworthy than men, that men were more likely to engage in inappropriate behavior or that the defendant's policy was to investigate women's claims of harassment more rigorously. Defendant's stated sexual harass-

ment policy could not have led the plaintiff to believe that the company always sided with women when investigating claims of sexual harassment. The fact that one of the Human Resources department employees is a woman is not and cannot by itself be evidence that defendant engaged in direct discrimination against white males. On this issue, the court notes that most of the disciplinary actions were taken against the plaintiff while a man was the head of the Human Resources department. Plaintiff's direct supervisor was also male.

■ In the absence of direct discrimination by the defendant, plaintiff may attempt to prove such discrimination through indirect evidence or by showing that the *McDonnell Douglas* presumption applies. If the plaintiff uses indirect evidence to prove discrimination, he must "allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred."[27]

Plaintiff lists the following factors in support of his discrimination claim: (1) defendant ignored plaintiff's complaints about Farley's alleged behavior and failed to investigate plaintiff's allegations; (2) defendant ignored allegations of Farley's inappropriate behavior toward other male co-workers; (3) defendant failed to discipline Farley for her conduct; (4) defendant issued identical reprimands to plaintiff and Farley although the complaints about Farley were more serious; (5) defendant ignored plaintiff's complaints about Farley's continuous contact with him after the first disciplinary action while reprimanding the plaintiff again for attempt-

---

23. *Id.*

24. Plaintiff's response to defendant's motion for summary judgment (Doc. 63) at p. 44.

25. 175 F.3d 1193 (10th Cir.1999).

26. *Id.* at 1199–1200.

27. *See Notari,* 971 F.2d at 590.

ing to contact Farley; (6) a woman took over as head of the defendant's Human Resources department; and (7) defendant had a practice of "condoning sexual harassment by female employees while acting hypersensitive to the behavior of male employees towards female employees."[28]

In reviewing the motion for summary judgment, the court is obligated to view all the evidence in the light most favorable to the plaintiff. The court, having considered plaintiff's allegations at great length, finds that a reasonable jury could determine that, but for the plaintiff's gender, defendant's actions would have been different.

While the defendant may have acted reasonably and without discriminatory motives when it chose not to delve into allegations of sexual relationship between two of its adult employees, the court is not persuaded that both Farley's and plaintiff's complaints were afforded equal consideration. The court recognizes that in the case where both parties were alleged to engage in inappropriate behavior—i.e. the complaints by plaintiff and Farley in June of 1999—defendant took identical action and requested that both agree to future restrictions. However, in January 2000, defendant had warned only the plaintiff against further direct and indirect contact with Farley because allegedly only the plaintiff violated defendant's prior directive. Plaintiff, though, claims that during the time he was subject to adverse disciplinary actions, he complained to the management on at least three occasions regarding Farley's conduct and there appears to be no evidence in the record to show that defendant investigated any of these complaints.

Furthermore, defendant's conduct of other alleged sexual harassment investigations involving Farley may provide additional credence to plaintiff's claim that defendant was more tolerant towards women's conduct. For example, it appears that nobody in defendant's Human Resources department ever discussed with Farley the allegations that other men felt uncomfortable because of her behavior. Furthermore, the record does not reflect that any effort was made by the defendant to investigate Farley's behavior in totality and determine whether a pattern of inappropriate behavior may exist. The court finds that a reasonable jury may question why such other incidents of Farley's allegedly inappropriate acts were cast aside while complaints about plaintiff given full attention.

After viewing all the evidence in the light most favorable to the plaintiff, the court finds that plaintiff presented facts sufficient to support a reasonable inference that but for plaintiff's gender, defendant's conduct would have been different. Therefore, the court concludes that the plaintiff has established a prima facie case of gender discrimination. The court must next determine whether defendant has advanced a sufficient nondiscriminatory reason for its conduct and whether plaintiff can establish that such reason is a mere pretext for impermissible discrimination.

### 2. Facially Nondiscriminatory Justification for Defendant's Actions.

■ Defendant claims plaintiff was disciplined more severely because plaintiff violated defendant's directives not to contact Farley and such violations were brought to defendant's attention. The court finds that defendant has met its burden of producing a facially nondiscriminatory reason for disciplining the plaintiff.

---

**28.** Plaintiff's response to defendant's motion for summary judgment. (Doc. 63).

### 3. Pretext.

Once defendant offers a facially nondiscriminatory justification for its decision to discipline the plaintiff and not Farley, plaintiff can still defeat summary judgment if he demonstrates that a "genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." [29] Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." [30]

The court, having reviewed all the evidence in the light most favorable to the plaintiff, finds that the justification for defendant's conduct cannot be determined without weighing the credibility of a number of defendant's employees. Because credibility issues cannot be decided by the court and must be presented to the jury, the court concludes that a genuine issue of material fact exists regarding defendant's proffered justification. Therefore, the court finds that plaintiff's claim of gender discrimination can survive defendant's motion for summary judgment.

### B. Sexual Harassment.

Plaintiff's second cause of action is that he was the victim of sexual harassment at his workplace. Plaintiff may establish sexual harassment under Title VII if he demonstrates that he was subjected to a hostile work environment.[31] In certain circumstances, an employer can be held liable for an employee's sexually offensive conduct which creates a hostile work environment.[32]

To survive summary judgment on a hostile work environment claim, plaintiff must show that a "rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [33] Title VII does not provide redress for a working environment "merely tinged with offensive sexual connotations." [34] Therefore, the plaintiff "must not only show that [he] subjectively perceived the environment as hostile or abusive, but that [his] perception was objectively reasonable." [35] The court is charged with the duty of filtering "out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." [36]

---

**29.** *See Cash v. The Boeing Co.,* 76 F.Supp.2d 1229, 1233 (D.Kan.1999).

**30.** *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

**31.** *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1261 (10th Cir. 1998).

**32.** *See Harrison v. Potash, Inc.,* 112 F.3d 1437, 1442 (10th Cir.1997).

**33.** *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993): *see also Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1261 (10th Cir.1998); *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

**34.** *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**35.** *See Apgar v. State of Wyoming,* 2000 WL 1059444, 2000 U.S.App. LEXIS 18633 (10th Cir. August 2, 2000) (citing *Davis,* 142 F.3d 1334, 1341).

**36.** *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citations omitted).

To determine whether the harassment was sufficiently severe or pervasive, the court must examine the totality of the circumstances, including such things as the "frequency of the discriminating conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [37] In order to be actionable, a sexually objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." [38] The conduct in question must be motivated by gender bias. However, where at least some of the conduct complained of by the plaintiff appears to be gender-neutral, plaintiff can still demonstrate hostile work environment because such conduct must be viewed "in the context of other, overtly gender-discriminatory conduct." [39] "Thus, even if some of the alleged conduct was not 'explicitly sexual in nature,' if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex- and gender-related conduct occurred, then it is for the factfinder to decide whether such an inference should be drawn." [40]

 The court has isolated the following instances that could support plaintiff's claim of hostile work environment: (1) Farley's repeated telephone calls to his office telephone and pager prior to the flower incident in 1999 [41]; (2) an alleged incident of inappropriate touching by Farley when plaintiff was working on her computer; (3) complaint about the flowers; (4) spreading of "lies and rumors" about the plaintiff following the flower incident, such as alleged statements by Farley that she propositioned the plaintiff and he turned her down and that she "got him fired;" (5) "snickering" and laughter by other female employees; and (6) alleged incident where Farley called plaintiff a "psycho" behind his back.

From the outset, the court concedes that this is a very close case. Plaintiff did not suffer the kind of obscene and lewd acts that are often the subject of sexual harassment actions.[42] However, the plaintiff may still produce "evidence that [he] was the object of harassment because of [his] gender" [43] and the court is required to view all the evidence in totality and in a light most favorable to the plaintiff. Once this evaluation is complete, the court must determine whether the conditions of plaintiff's employment were so severely altered as to create an abusive work environment. It appears that at least some of the evidence presented to the court does not necessarily justify the inference that the harassment was gender-motivated. For example, the allegation that Farley called plaintiff "psycho" is not a gender-motivated insult. However, because the court must review

**37.** *See Harris,* 510 U.S. at 23, 114 S.Ct. 367.

**38.** *See Faragher,* 524 U.S. at 787, 118 S.Ct. 2275, citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367.

**39.** *See O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1097 (10th Cir.1999).

**40.** *Id.* (citations omitted).

**41.** Defendant contends that all behavior that took place prior to June 18, 1999 is irrelevant. The court disagrees. Plaintiff was not required to complain about unwelcome behavior the first instant it occurred and the court will consider evidence of alleged harassment that took place prior to Farley's complaint.

**42.** *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 60, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (unwelcome sexual advances); *see also Beard v. Flying J, Inc.,* 266 F.3d 792 (8th Cir.2001) (unwelcome sexual touching and comments).

**43.** *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998.

evidence of all alleged harassing activity, even if some instances were not gender-motivated, the court will consider all evidence offered by plaintiff in his pleadings, beginning its inquiry prior to the alleged flower incident and concluding with plaintiff's termination.

When reviewed in its totality, the court concludes a fact finder could find that the behavior plaintiff endured was motivated by gender. Farley's initial pursuit of the plaintiff and the alleged comments regarding her proposition to him appear to be based on his gender, and the relationship that ensued would not have happened but for plaintiff's gender. Furthermore, Farley's behavior toward the plaintiff could be viewed as similar to her alleged behavior toward her other male co-workers, which, too was gender-motivated. Defendant argues that because plaintiff admits to having a consensual relationship with Farley, Farley's behavior was not "unwelcome." However, the court is not prepared to rule on the subjective question of whether initially plaintiff may have resented Farley's advances or whether he resented her comments to others regarding their relationship, or lack thereof. In addition, engagement in a consensual relationship would not cause the plaintiff to either consent to or welcome the alleged incidents of laughter, ridicule, "snickering," and name-calling following the end of such relationship.

The court takes notice of the fact that the plaintiff never complained about Farley's alleged advances until Farley lodged a complaint against him. Plaintiff articulated two reasons for his lack of assertiveness: (1) that he did not believe it was "proper protocol," and (2) that he did not want to hurt Ms. Farley's feelings. The court understands that our society discourages men from complaining. Given such societal pressures, it may be difficult for a

man to lodge a complaint grounded in charges of sexual advances. The court is satisfied that sufficient evidence has been presented from which a jury might conclude that plaintiff did not welcome Farley's initial advances, her continuous pursuit of him, and the atmosphere created as a result of "lies and rumors" allegedly spread by Farley.

Finally, plaintiff claims that the atmosphere created by Farley was so severe as to cause him to suffer severe distress. This claim is supported by evidence that plaintiff's supervisor noticed a change in the plaintiff and even advised him to seek psychiatric counseling. The court finds that a reasonable jury might conclude that the plaintiff's working environment was sufficiently altered.

For the purpose of resolving summary judgment, the totality of circumstances surrounding Farley's behavior and defendant's knowledge of such behavior and plaintiff's feelings about it is sufficient to show that plaintiff was subjected to unwelcome behavior that altered his working environment. Therefore, the court finds that plaintiff demonstrated sufficient questions of material fact to preclude entry of summary judgment for the defendant on the issue of sexual harassment.

### C. Retaliation.

Title VII makes it unlawful for an employer to retaliate against an employee for participating in certain protected activity, including opposing discrimination.[44] Plaintiff claims he was coerced into signing the No Contact Memorandum and ultimately discharged in retaliation for opposing sexual harassment and gender discrimination. Customarily, Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden shifting analysis.[45] As such, the plaintiff must first present a prima

44. *See* 42 U.S.C. § 2000e–3(a).

45. *See McGarry,* 175 F.3d at 1201.

facie case of retaliation.[46] Once the plaintiff has satisfied this requirement, the burden shifts to the defendant to produce a legitimate, non-discriminatory justification for taking the action in question.[47] If the defendant is able to produce a facially non-discriminatory reason for its firing decision, the burden returns to the plaintiff to show that defendant's reason is merely a pretext for discrimination.[48] Defendant argues plaintiff has not demonstrated a valid prima facie case nor shown that defendant's proffered reason was pretextual.

### 1. Prima Facie Case.

To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination (or participation in a Title VII proceeding not alleged in the case at bar); (2) defendant took adverse action against him and (3) a causal connection between the protected opposition and the adverse action.[49]

To demonstrate the first element of the prima facie case, plaintiff must show that he engaged in protected opposition to discrimination. In addition to his initial interview regarding the complaint reporting the flowers, Plaintiff argues that his attempts to communicate with Farley through Forrest and his conversations with Paul Pullen constitute protected op-

position. A plaintiff's opposition is protected provided it was based upon a good faith belief that a Title VII violation occurred, even if no violation actually took place.[50]

An employee need not formally file a charge against the harasser to qualify as engaging in protected opposing activity. "It is well-established that an employee's express complaints to supervisors about perceived discriminatory practices constitutes protected activity."[51] There is no clear standard to apply when determining whether a communication by an employee is sufficiently specific to constitute protected opposing activity.[52] An employee is not required to use legal terms or buzzwords when opposing discrimination. The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination.[53] However, protected activity must oppose discrimination prohibited by Title VII, and not merely take form of complaints about personal grievances.[54]

The courts have set a relatively low bar for a plaintiff responding to a summary judgment motion to show that he engaged in protected opposition to discrimination. Even informal complaints to management can, under some circumstances, satisfy the participation prong.[55]

**46.** *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**47.** *Id.*

**48.** *Id.*

**49.** *See McGarry,* 175 F.3d at 1201.

**50.** *See Plakio v. Congregational Home, Inc.,* 902 F.Supp. 1383, 1392 (D.Kan.1995).

**51.** *See Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 559–60 (D.Kan.1995) (citing EEOC Compliance Manual section 8006 and defining protected opposing conduct as com-

plaints to management, unions, other employees, and newspapers).

**52.** *Id.* at 560.

**53.** *Id.,* citing *Truskoski v. ESPN, Inc.,* 823 F.Supp. 1007, 1012 (D.Conn.1993) (holding complaints about disparate impact of staffing policy having "overtones of gender bias and discrimination" constituted protected opposition).

**54.** *See Garcia–Paz,* 873 F.Supp. at 560.

**55.** *See Jeffries v. Kansas,* 147 F.3d 1220, 1231 (10th Cir.1998).

The plaintiff claims that he repeatedly discussed his concerns about Farley with his direct supervisor, Mr. Pullen, and he testified to making three formal complaints to the defendant's management. It is unquestionable that defendant was aware of plaintiff's concerns about Farley's behavior. Furthermore, plaintiff objected to defendant's handling of Farley's complaints and he made his objections known to Mr. Pullen. The court finds that the plaintiff has presented sufficient minimal evidence that he engaged in protected opposition to discrimination to sustain his burden on the first element of the prima facie claim.

■ With respect to the second element of the prima facie case, plaintiff's employment was terminated in April 2000. Involuntary termination constitutes adverse employment action.[56] Furthermore, the No Contact Memorandum and the requirement that he take two weeks off work could also constitute adverse employment action. Plaintiff has satisfied the second element of the prima facie case.

■ To establish the third element of the prima facie case, plaintiff must show a causal connection existed between the protected activity and the adverse employment action. Protected activity closely followed by adverse action may justify an inference of retaliatory motive.[57] Plaintiff was terminated ten months after he initially complained about Farley's behavior.

His subsequent complaints in November and December of 1999 were much closer in time to the January 2000 No Contact Memorandum and the April 2000 termination.

The Tenth Circuit has cautioned the courts against reading the temporal proximity requirement too restrictively where there is a pattern of retaliatory acts that begins shortly after engaging in protected activity and later culminates in actual discharge.[58] A pattern of retaliation may be formed by showing heightened scrutiny, negative criticism, adverse evaluation, differential treatment, or violations of standard internal protocol and procedures.[59]

Plaintiff's discussion of his retaliation claim appears to suggest that defendant engaged in a pattern of disciplinary activity that consisted of reprimanding plaintiff for attempting to indirectly contact Farley, requiring him to take two weeks off work, and ultimately terminating him. Furthermore, plaintiff claims that he was counseled against contacting Farley even on his own time to collect the money she owed him on VCR repairs. While this is not a disciplinary action by the defendant, it does demonstrate that plaintiff was subjected to higher scrutiny in his actions even away from work. And although the court has difficulty with this element of the prima facie case, there is evidence on the

---

**56.** *See Burlington Industries, Inc., v. Ellerth,* 524 U.S. 742, 762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (holding that action is adverse if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote ... or a decision causing a significant change in benefits").

**57.** *See Marx v. Schnuck Mkts., Inc.,* 76 F.3d 324, 329 (10th Cir.1996).

**58.** *See Marx,* 76 F.3d at 329 (finding a pattern where defendant began citing plaintiff for job deficiencies within one month of plaintiff's

reporting of violation and continued for three months culminating in a demotion eleven months later). *But see Conner v. Schnuck Mkts., Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (holding a four-month period standing alone is insufficient to establish causation); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (holding a three-month delay without more is insufficient to establish causation).

**59.** *See Lee v. New Mexico State Univ. Bd. of Regents,* 102 F.Supp.2d 1265, 1277 (D.N.M. 2000) (citations omitted).

record that suggests the defendant's actions were related to plaintiff's complaint.

The plaintiff was terminated after twelve years of employment, during which time defendant was never unsatisfied with plaintiff's job performance. This fact, together with other evidence presented by plaintiff, leads the court to believe that a reasonable jury could find that a causal connection exists between plaintiff's continuous complaints about Farley's behavior and defendant's handling of the complaints and his eventual termination.

The court finds the totality of the evidence, viewed in the light most favorable to the plaintiff, is sufficient to establish a causal connection. Therefore, the court finds plaintiff has presented evidence sufficient to state a prima facie case of retaliation.

### 2. Facially Nondiscriminatory Justification for Discharge.

■ Defendant claims plaintiff was discharged for violating a clear directive to avoid all contact, direct and indirect, with Farley on company time or property. The record presented to the court demonstrates that defendant indeed considered plaintiff to be in violation of the No Contact Memorandum and felt justified in its decision to discharge the plaintiff for such violation. The court finds that defendant has met its burden of producing a facially nondiscriminatory reason for discharging plaintiff.

### 3. Pretext.

If plaintiff can demonstrate that defendant's proffered justification for termination is pretextual, then his claim can survive the summary judgment motion.[60]

Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence."[61]

The court, having reviewed all the evidence submitted in support of this motion for summary judgment, is unable to categorically determine that defendant's justification for terminating the plaintiff is not a pretext for some other underlying motivation. The court feels that plaintiff has presented sufficient evidence for a reasonable jury to find that defendant's proffered justification is unworthy of credence. Therefore, the court finds that plaintiff has met his burden of showing that a genuine issue of material fact exists with respect to the retaliation claim. The court finds that plaintiff's retaliation claim can survive defendant's summary judgment motion.

### D. Damages.

In addition to the substantive claims addressed above, defendant in its summary judgment motion advances arguments regarding limitation on damages in a Title VII action. While the court recognizes defendant's arguments, it declines to address this issue in this order and defers all decisions on damages until trial.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. 55) is denied.

---

**60.** *See Kendrick v. Penske Trans. Servs., Inc.,* 220 F.3d 1220, 1234 (10th Cir.2000) (citing *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995)).

**61.** *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).